**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PHILIPS NORTH AMERICA LLC, | ) | |
| KONINKLIJKE PHILIPS N.V., and | ) | Case No. 21-cv-3615 |
| PHILIPS INDIA LTD., | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GLOBAL MEDICAL IMAGING, LLC | ) | |
| d/b/a AVANTE ULTRASOUND, | ) | |
| AVANTE HEALTH SOLUTIONS f/k/a | ) | |
| JORDAN HEALTH PRODUCTS, LLC, | ) | |
| and JORDAN INDUSTRIES | ) | |
| INTERNATIONAL, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs bring suit against Defendants for allegedly using hacking tools to modify, tamper with, and alter Plaintiffs' ultrasound systems. Currently before the Court are Defendants' motion to dismiss for failure to state a claim [20] and Plaintiffs' motion for leave to file a surreply in opposition [33]. For the reasons that follow, both motions, [20], [33], are denied.

**I.    Background**

The following facts are taken from the complaint. All well pled facts are assumed to be true for purposes of Defendants' motion to dismiss. *Zimmerman v. Bornick*, 25 F.4th 491 (7th Cir. 2022). Plaintiff Philips North America LLC is a medical imaging device company that supplies healthcare providers throughout the United States with medical imaging devices such as ultrasound systems and X-ray machines. Philips is a subsidiary of Plaintiff Koninklijke Philips N.V., which is organized and headquartered in the Netherlands. Plaintiff Philips India Ltd. is organized and headquartered in India and is the owner or co-owner of certain copyrights that are the subject of

Plaintiffs' complaint. The complaint refers to the three Philips entities collectively as "Plaintiffs" and "Philips."

The Philips name has become commonly known as the provider of specific branded lines of medical imaging devices, such as "CX," "HD," "ClearVue," and many others (collectively, "Philips ultrasound systems"). Since 2004, Philips has also sold refurbished models of its branded products as part of its Diamond Select program. Philips authorizes certain third parties in certain territories to distribute Philips ultrasound systems, including Philips' refurbished machines under the Diamond Select brand name.

Philips develops, manufactures, sells, and subsequently supports, maintains, repairs and services these medical imaging systems through proprietary hardware, software, and trade secrets contained within the proprietary software and hardware. Philips' software was developed by and is owned by Philips entities and is protected by certain Registered Copyrights, which Plaintiffs set forth in Exhibit A to the complaint. See [1] at 9; [1-1] (63 pages of Certificates of Registration from the United States Copyright Office for computer programs and proprietary computer program code).

The specific versions and functionalities of the ultrasound systems enabled on a particular system can vary, and Philips licenses the use of features on each specific system. Because the proprietary software enabled on the ultrasound systems allows them to function and controls what licensable features are available for copying into memory to be available for use, the proprietary software includes strict access controls to limit access to software features. These access controls also control access to optional software which enables certain system features and which Philips licenses to end users for a fee.

The ultrasound systems that Philips currently sells or that are active in the field are driven by one of three software platforms: (1) Philips Boris Platform; (2) Philips Voyager Platform; and (3) Philips Common Platform software. Each of these platforms was created and is owned by Philips and includes Philips' confidential and proprietary information, intellectual property, and trade secrets. Philips has also registered the copyright in its proprietary software for the following ultrasound systems: EPIQ5, EPIQ7, Affinity 30, Affinity 50, and Affinity 70. These models execute software subject to copyright registrations covering Voyager Platform Versions 1.5, 1.7, 1.8, 2.0, 3.0, 4.0.2, and 5.0.1; CX50 Versions 1.0 and 5.0; CX30 Versions 1.0 and 2.0; ClearVue 350 Versions 2.0 and 3.2; ClearVue 550 Versions 2.0 and 3.2; ClearVue 580 Version 2.0; ClearVue 650 Versions 1.0 and 3.2; ClearVue 850 Versions 3.1 and 3.2; HD15 Versions 1.0 and 3.0; SPARQ Versions 1.0 and 3.0; VISIQ Version 1.0; XPERIUS Versions 1.1 and 2.0; HD11 Versions 1.0 and 1.2; STS; CRC Tool 2014; and CRC Tool 2018.

Each ultrasound system, whether driven by Boris Platform software, Voyager Platform software or Common Platform software, includes both model specific features and machine specific set features that Philips enables on each ultrasound system pursuant to the license that the end user purchases. An ultrasound system may also support optional hardware add-ons and features, which Philips can enable if the end user purchases an additional license.

Philips uses multiple layers of technological controls to protect Philips' copyright-protected works from unauthorized access. These controls include user-specific access codes and hardware keys, which enable the software access and control features for a particular registered user. These user-specific access controls permit access to enabled Philips tools and features based on a user's registered access authorization level. These controls also include machine-specific access controls which permit users access only to the features and tools that have been enabled on

3

a specific device. Philips further protects its trade secrets and proprietary software with both contractual restrictions and access controls, which only allow individuals access to informational material consistent with the authorization level of their user credentials.

Each ultrasound system includes certain software and hardware features that may only be used when a particular licensable feature is enabled. For each Philips ultrasound system sold, only the licensed features and tools are enabled, and only the specific authorized users of the machine can access the enabled features and software options. Philips' optional licensable features control access to Philips' proprietary software and limit the options available on each ultrasound system. Features and add-ons that have not been licensed are not accessible on the ultrasound system or by the authorized user. Any attempt to use an unlicensed feature on an ultrasound system will result in an error message that the feature is not compatible with the system and/or the machine specific access controls will prevent access to the unlicensed feature. If a specific hardware add-on requires a software feature be enabled to make use of such hardware, absent the required software, Philips ultrasound systems will report an incompatible device and the related software will be disabled.

Philips also controls access to proprietary manuals and documents with instructions for use of its proprietary software, which together with its proprietary software, Philips refers to as its customer service intellectual property ("Philips CSIP"). Philips retains ownership of its CSIP even though the physical machine upon which Philips CSIP resides may itself be owned by a hospital, medical center, or other Philips customer. Displays on computer screens that appear in connection with accessing Philips' software on ultrasound systems, and the contents of written service and maintenance manuals used by technicians to access Philips ultrasound systems, contain various written warnings, disclosures, and notices that place the user on notice that the software and information being accessed is Philips' proprietary and confidential software that is to be accessed

only by authorized and licensed users, and that passwords provided by Philips in connection with such access are subject to terms and conditions restricting their usage.

Philips has spent considerable time and money creating this software and developing access controls to limit and control access to these features. Philips controls who holds a license for specific restricted tools and features and what features and options are available and accessible on a particular ultrasound system. Philips also requires end users to register for authorized access. These same controls prevent unlicensed access to and copying of the software.

Defendant Global Medical Imaging, LLC d/b/a Avante Ultrasound ("GMI") advertises itself and its "family of companies" as "a single source provider of medical, surgical, diagnostic imaging, and radiation oncology equipment, including sales, service, repair, parts, refurbishing, and installation." [1] at 2 & n.2. GMI is the ultrasound arm of Defendant Avante Health Solutions f/k/a Jordan Health Products, LLC ("Avante"). GMI is advertised on the Avante website as the "one source for complete ultrasound service, parts and equipment." *Id*. at 2. Based on information and belief, Defendant Jordan Industries International, LLC ("Jordan") acquired GMI in October 2015. See *id.* at 5.[1] On information and belief, following the acquisition, Avante and Jordan took over control and leadership of GMI and have been funding, overseeing, supervising and directing the business. See *id*.

The complaint alleges that since that acquisition, GMI, at the direction of and for the financial benefit of Jordan and Avante, acts under the d/b/a Avante Ultrasound in furtherance of an unlawful scheme to trade off of and use Philips' proprietary and trade secret software, tools and information. More particularly, the complaint alleges that Defendants have engaged in an unlawful scheme consisting of three independent activities: (1) the modification of Philips ultrasound

---

[1] Each of the three Defendants has its principal places of business in this judicial district.

systems to enable software configurations and features without permission and the sale of modified ultrasound systems for a profit; (2) the sale of "24 hour access keys" to customers and third parties, intended for use by Defendants and their customers to circumvent and bypass Philips' security measures and access controls to gain access to unlicensed options and proprietary service and diagnostic tools within Philips ultrasound system software, and (3) the use, by Defendants and their customers, of "24 hour access keys" to circumvent and bypass Philips' security measures and access controls to force compatibility and interoperability between Philips medical imaging devices and related hardware devices and to support Defendants' ultrasound service and repair business.

**Modifications –** Plaintiffs allege on information and belief that, in order to gain access to and modify Philips' proprietary software, Defendants hack into or cause, authorize, and direct others to hack into its ultrasound systems by circumventing Philips' access controls, including through the use of a counterfeit key generator and other modification tools. The alleged modifications also include circumventing additional access controls within Philips' systems to permanently enable optional software tools and features that consumers could only otherwise access by purchasing licenses from Philips. On information and belief, Defendants' scheme also includes making modifications to, or causing others to modify, Philips ultrasound systems to permanently enable combinations of optional features that consumers could never obtain from Philips, because Philips does not sell or support them. On information and belief, Defendants' scheme also includes modifying, or causing others to modify, Philips ultrasound systems to enable software features that, at the time they were enabled, have not yet been approved for commercial and clinical use. On information and belief, Jordan supervises, approves, and authorize GMI and Avante's unauthorized modifications to Philips ultrasound system software and profits as a result.

6

**24-hour access keys** – Plaintiffs allege on information and belief that Defendants unlawfully developed, created, took, and/or purchased a counterfeit key generator, which GMI and Avante advertise, market, and sell to customers and other third parties for a profit. On information and belief, GMI and Avante advertise, market and sell "24-hour access keys" to customers and other third parties when they sell or provide a Philips ultrasound replacement part or component.

On information and belief, GMI, in concert with and for the benefit of Avante and Jordan, has regularly provided 24-hour keys to at least six hospitals where GMI sells parts. The keys give Defendants and their customers unauthorized access to Philips proprietary information in order to force compatibility and interoperability of the replacement parts sold by GMI and Avante and to enable unlicensed clinical options and features. On information and belief, Jordan has knowledge of and profits from GMI's and Avante's advertising, marketing, use and sale of these 24-hour access keys and funds, supervises, approves and authorizes Avante's activities.

**Use of 24-hour access keys to support Defendants' ultrasound service and repair business –** Purchasers of Philips ultrasound systems, such as hospitals and health care providers, may obtain post-warranty maintenance and other servicing from Philips, or they may use independent, non-Philips companies for maintenance and servicing. GMI and Avante provide competing, non-Philips maintenance and servicing for Philips ultrasound systems. Defendants offers such services, at least in part, by improperly using Philips confidential and proprietary information, which they access by using the 24-hour access keys to circumvent Philips access controls and security measures.

On information and belief, GMI and Avante supply the "24-hour access keys" to customers with purchase replacement parts. GMI and Avante use and cause their customers to use the access keys to obtain access to and use Philips proprietary diagnostic and service tools, without paying

for a license, to service, repair and test Philips ultrasound systems and to force compatibility and interoperability between Philips medical imaging devices and replacement parts. On information and belief, GMI and Avante also use the "24-hour access keys" to access and use proprietary features and tools that are reserved for Philips' authorized personnel and which Philips does not license to third parties.

On information and belief, Jordan has knowledge of the 24-hour access keys and use of the 24-hour access keys, and has conspired with Avante and GMI to use the 24-hour access keys to tortiously interfere with Philips Software License Agreement and Terms and Conditions of Sale to cause owners of Philips ultrasounds to breach those Agreements in order for Defendants to make a profit selling competing services.

Plaintiffs allege on information and belief that Defendants engaged in the foregoing unlawful conduct on at least two ultrasound systems discovered onsite by Philips Field Service Engineers ("FSEs"). They further allege on information and belief that Defendants have engaged in and continue to engage in similar conduct at other hospitals throughout the country. In particular, in March 2020, a Philips FSE onsite and performing routine service and maintenance discovered that St. Peters Hospital in Albany, New York had an Epiq ultrasound system with unlicensed software and clinical options. On information and belief, St. Peters Hospital purchased the system from third party Soma Technology, which purchased the system from Defendant GMI. On information and belief, prior to selling the system to Soma Technology, GMI (in concert with Avante and Jordan) used a counterfeit key generator and other hacking tools to bypass Philips' security and access controls to enable additional clinical options, without paying for a license. On information and belief, GMI (in concert with Avante and Jordan) modified the software on the Epiq ultrasound to enable additional clinical options, including the clinical option "Transducer

8

Option VeriSight" that, at the time of discovery in March 2020, was not FDA-approved or available for license and use. Neither Defendants, nor their customers, were licensed by Philips to enable or use these options. On information and belief, prior to selling the system to Soma Technology, GMI (in concert with Avante and Jordan) also used a counterfeit key generator and other hacking tools to upgrade the software on the system from version 1.7 to version 5. Defendants were not licensed by Philips to upgrade or use software version 5.0.

Around December 2020, a Philips FSE was onsite at Beaumont Dearborn Hospital in Michigan in response to a service request for an ultrasound system. While onsite and servicing the system, the FSE was told by hospital personnel that Avante was onsite the prior day and had been playing with and deleted all of the DICOM presets. The DICOM settings are used to store, exchange, and transmit images from Philips ultrasound systems. On information and belief, Avante accessed and altered the DICOM presets using a counterfeit key generator and other hacking tools. Defendants were not authorized by Philips to make changes to the software or options on the St. Peters Hospital or Beaumont Dearborn Hospital systems. Plaintiffs allege on information and belief that discovery will reveal that Defendants have engaged in similar unauthorized conduct at numerous hospitals throughout the country.

Plaintiffs' complaint contains nine remaining counts. Counts I and II are brought against all Defendants for violations of Section 1201 and 1202 of the Digital Millennium Copyright Act ("DMCA"), respectively. See 17 U.S.C. §§ 1201, 1202. Counts III and IV are brought against Avante and GMI for trade secret misappropriation in violation of federal law, 18 U.S.C. § 1836, and the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* Count V alleges that Avante and GMI have violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a). Count VI, against all Defendants, is a claim for copyright infringement in violation of 17 U.S.C. §§ 101, 501

*et seq.* Count VII alleges that Avante and GMI have engaged in tortious interference with contractual relations, while Count VIII alleges that Jordan has engaged in civil conspiracy to tortiously interfere with contractual relations. Count IX alleges that all Defendants have engaged in unfair competition in violation of Illinois common law.[2] The particulars of these counts are discussed in greater detail below, to the extent necessary to decide the motion to dismiss.

## II. Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to plead "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint that fails to meet this standard may be dismissed under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When evaluating the complaint, the Court must "treat all allegations as true and … draw all reasonable inferences in the plaintiff's favor." *Zimmerman v. Bornick*, 25 F.4th 491 (7th Cir. 2022).

To survive a motion to dismiss, "the complaint must 'contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Flores v. City of South Bend*, 997 F.3d 725, 728-29 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is plausible if it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The Seventh Circuit has interpreted this to require the plaintiff to "'give enough details about the subject-matter of the case to present a story that holds together.'" *West Bend Mutual Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016) (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010)). "In other words, the court will ask itself *could* these things have happened, not *did* they happen."

---

[2] Count X is a claim for injunctive relief. Defendants move to dismiss this count on the basis that injunctive relief is a remedy rather than a cause of action. In response, Plaintiffs agree to withdraw Count X, making that part of Defendants' motion to dismiss moot.

*Id.* At the end of the day, "the plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679).

The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011); *Spearman v. Elizondo*, 230 F. Supp. 3d 888, 892-93 (N.D. Ill. 2016). It is proper for the Court to "consider, in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013) (citing *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)); see also Fed. R. Civ. P. 10(c). Further, although it is well established that a "complaint may not be amended by the briefs in opposition to a motion to dismiss," *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 348 (7th Cir. 2012), the Court may "consider additional facts set forth in" a brief opposing dismissal "so long as those facts 'are consistent with the pleadings.'" *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013) (quoting *Geinosky*, 675 F.3d at 745 n.1); see also *In re Dealer Management Systems Antitrust Litigation*, 313 F. Supp. 3d 931, 938–39 (N.D. Ill. 2018).

## III. Analysis

### A. Section 1201 of the DMCA (Count I) and Copyright Infringement (Count VI)

In Count I, Plaintiffs allege that Defendants have intentionally and knowingly circumvented technological measures that Philips uses to effectively control access to copyrighted works, in violation Section 1201 of the DMCA, 17 U.S.C. § 1201(a)(1). In Count VI, Plaintiffs allege that Defendants have engaged in copyright infringement. Defendants argue that both counts must be dismissed because their alleged misconduct is excluded from copyright protection by the

"essential step" exclusion and "machine repair and maintenance" exclusion set forth in 17 U.S.C. § 117.

The essential step exclusion provides that "it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided: (1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner, or (2) that such new copy or adaptation is for archival purposes only and that all archival copies are destroyed in the event that continued possession of the computer program should cease to be rightful." 17 U.S.C. § 117(a).

"Congress enacted the essential step defense to codify that a software user who is the 'owner of a copy' of a copyrighted software program does not infringe by making a copy of the computer program, if the new copy is 'created as an essential step in the utilization of the computer program in conjunction with a machine and ... is used in no other manner.'" *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1109 (9th Cri. 2010). Courts interpreting this provision have held that the essential step defense is applicable only if the alleged infringer is an owner, as opposed to licensee, of the copy of the software in dispute. *Id.* at 1108-09; see also *Midway Mfg. Co. v. Artic Int'l, Inc.*, 704 F.2d 1009, 1012 (7th Cir. 1983) (explaining that section 117, both prior to and after a 1980 amendment, "was intended only to leave unaltered the existing law governing the exclusive rights of *owners* of copyrights in computer programs" (emphasis added)); *ISC-Bunker Ramo Corp. v. Altech, Inc.*, 765 F. Supp. 1310, 1332 (N.D. Ill. 1990) (explaining that section 117 "gives the lawful owner of copyrighted software the limited right to make certain types of copies of the software for its own internal use on its own machines" but "affords no immunity whatsoever to infringers such as [defendant] that have come into unauthorized possession of the software"); *MDY Industries,*

*LLC v. Blizzard Entertainment, Inc.*, 629 F.3d 928, 939 (9th Cir. 2010) (players of "World of Warcraft" computer game did not own their copies of the software, and therefore "may not claim the essential step defense" and "may infringe unless their usage is within the scope of" their limited license); *Adobe Systems Inc. v. A & S Electronics, Inc*., 153 F. Supp. 3d 1136, 1145 (N.D. Cal. 2015) (denying alleged copyright infringer's motion to dismiss based on the essential step doctrine where "the pleadings sufficiently allege that Defendants are licensees, not owners").

The Court agrees with Plaintiffs that dismissal is not warranted based on the essential step exclusion because the Complaint plausibly alleges infringing conduct that goes beyond the exclusion's coverage. The Complaint alleges that Defendants do not own, and do not have a license to use, Philips' copyrighted software. It further alleges that the owner of a Philips ultrasound system does not own the software on the system, but rather holds a license to use the software in the manner authorized by Philips. See [1] at ¶¶ 25-41, 48, 63, 178-82, 203-205. Taking these allegations as true, which the Court must at the motion to dismiss stage, Defendants would not be entitled to invoke the "essential step" exclusion as a defense to all of the alleged misconduct.

The Court next turns to the machine repair and maintenance exclusion, which provides that "it is not an infringement for the owner or lessee of a machine to make or authorize the making of a copy of a computer program if such copy is made solely by virtue of the activation of a machine that lawfully contains an authorized copy of the computer program, for purposes only of maintenance or repair of that machine, if—(1) such new copy is used in no other manner and is destroyed immediately after the maintenance or repair is completed; and (2) with respect to any computer program or part thereof that is not necessary for that machine to be activated, such program or part thereof is not accessed or used other than to make such new copy by virtue of the activation of the machine." 17 U.S.C. § 117(c). For purposes of this section, "maintenance" means

13

"the servicing of the machine in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that machine." *Id*. § 117(d)(1). "Repair" means "the restoring of the machine to the state of working in accordance with its original specifications and any changes to those specifications authorized for that machine." *Id*.§ 117(d)(2).

Dismissal on the pleadings is not warranted based on this defense, either, because the complaint alleges that Defendants engaged in conduct that goes beyond that protected by Section 117(d). The complaint does not allege that Defendants made "a copy" of Plaintiffs' software "for purposes only of maintenance or repair," that the copy was used in "no other manner," or that the was "destroyed immediately after the maintenance or repair." 17 U.S.C. § 117(c). Nor does the complaint suggest that Defendants were solely attempting to service or restore Philips ultrasound systems to "work in accordance with [their] original specifications" or "any changes to those specifications authorized for" those machines. *Id*. Rather, Plaintiffs allege that Defendants turned on Philips ultrasound systems to permanently enable unlicensed options and disable security measures and then hacked into the software, copied it, and illegally modified it. See [1] at ¶¶ 1-6, 42-72, 183-199. These allegations, if proven, would take Defendants' conduct beyond the protections of Section 117(d) and thus require denial of Defendants' motion at this stage of the case. See, e.g., *Storage Tech. Corp. v. Custom Hardware Engineering & Consulting, Inc*., 421 F.3d 1307, 1314 (Fed. Cir. 2005) ("Accessing software programs, such as freestanding diagnosis and utility programs, that are not needed to boot up the computer and make that determination, goes too far because access to those programs is not strictly necessary to verify that the computer is 'working in accordance with its original specifications.'"); *Allen-Myland, Inc. v. Int'l Business Machines Corp*., 746 F. Supp. 520, 536-37 (E.D. Pa. 1990) (engineering service's copying of

14

computer manufacturer's operating software for high performance computer system to accumulate library of software, or to make copies of software for reconfigured or split systems, was not performed as "essential step" in use of software with system under § 117).

Finally, the Court is not persuaded by Defendants' argument that Plaintiffs' DMCA and copyright claims are "effectively bar[red]" by rules recently promulgated by the Copyright Office and the Library of Congress concerning the circumvention of technological measures that control access to copyrighted works for the purpose of servicing medical devices and systems. [32] at 4, 6-7. According to Defendants, "the Copyright Office recommended and the Library of Congress adopted a statutory exemption to the DMCA for any circumvention necessary for the service, repair, and maintenance of medical imaging systems—exactly the conduct alleged in the Complaint." [32] at 4 (citing Section 1201 Rulemaking: Eighth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention at 208–12, 224–229, 231–33 (Oct. 2021); Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 86 Fed. Reg. 59627, 59635 & 59640 (Oct. 28, 2021) (to be codified at 37 C.F.R. pt. 201)). Accepting Defendants' summary of this complex rulemaking as accurate, it does not warrant dismissal because the complaint also alleges that Defendants have modified Philips' software. The new rule "does not consider whether modification is noninfringing" or constitutes "fair use" because the rule's "[p]roponents d[id] not seek an exemption to modify medical devices or systems, or their software." [32-1] at 212 (Section 1201 Rulemaking: Eighth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention at 208). Since Defendants have not demonstrated that the new rule bars Plaintiffs' DMCA or copyright claims or that modification is a "fair use," no surreply is necessary and Plaintiffs' motion for leave to file a surreply [33] is denied as moot.

###### B.     Section 1202 of the DMCA (Count II)

In Count II of the complaint, Plaintiffs allege that Defendants have modified their copyright management information ("CMI") in violation of 17 U.S.C. § 1202.  Section 1202(a) of the DMCA states that "[n]o person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement" provide or distribute false copyright management information ("CMI"). 17 U.S.C. § 1202(a)(1)-(2).  CMI includes "information conveyed in connection with copies or phonorecords of a work," including "[t]he name of, and other identifying information about, the copyright owner of the work."  *Id.*  § 1202(c)(3).  Section 1202(b) prohibits removal or alteration of CMI, distribution of CMI with knowledge that the CMI has been removed or altered, and distribution of copyrighted works with knowledge that CMI conveyed with the work has been removed or altered. See *id.* at § 1202(b)(1)-(3).  A violation of § 1202(b) also requires a showing that the defendant knew or had "reasonable grounds to know" that its actions would "induce, enable, facilitate, or conceal an infringement of any right under this title."

Defendants move to dismiss the Section 1202 claim for failing "to sufficiently identify the actual [CMI] it claims was altered or modified as required by both § 1202 (a) and (b)."  [22] at 7. According to Defendants, the complaint lacks detail concerning "what terms and conditions were allegedly modified or when or how they were modified," and "specific information regarding what identifying numbers have allegedly been altered or how they have been altered."  *Id*.  Defendants also argue that the complaint provides insufficient detail to conclude that the information that Plaintiffs claim to be CMI was "accessible in any way to the healthcare providers that Philips typically sells to," which Defendants assert is necessary for such information to constitute CMI. [22] at 8.

16

Defendants seek to hold Plaintiffs to a higher pleading standard than Rule 8, which does not require Plaintiffs to "plead particularized facts as to how, when, and to whom" Defendants allegedly communicated false CMI. *Carter v. Pallante*, 256 F. Supp. 3d 791, 801 (N.D. Ill. 2017); see also *Free Speech Sys., LLC v. Menzel*, 390 F. Supp. 3d 1162, 1175 (N.D. Cal. 2019) (explaining that at the pleading stage, a plaintiff need only identify CMI and plead facts to plausibly show that the alleged infringer knew that the removal, falsification or modification of the CMI could result in copyright infringement). The complaint's nine pages of detailed allegations are sufficient to put Defendants on notice of what they are alleged to have done. See [1] at 23-32. The Complaint describes Philips' CMI, including Philips automated rights enforcement program, the copyright notice within its licensed options software, the identifying information in the licensed options files, and the terms and conditions for use of Philips ultrasound systems. See *id.* at ¶¶ 98-99, 105, 107-111, 113, 115; see also 17 U.S.C. § 1202(c)(1)-(3), (6)-(7). The Complaint also details how Philips conveys its CMI through copyright notices, system unique identifying information, and terms and conditions of use. [1] at ¶¶107-111. The Complaint further alleges ways in which Defendants altered, modified, and distributed false CMI. See, e.g. ¶ 103 (Defendants modify CMI "when they enable optional features" because they violate the terms and conditions through which Philips has licensed the use of the software stored on the system and the identifying numbers that refer to CMI); ¶¶ 112, 113 (describing Defendants' modification of CMI when they enable an unlicensed option and thus change the unlicensed option statement to a licensed option statement), ¶¶115-116 (describing Defendants' modification of CMI when they perform unlicensed software upgrades). These detailed allegations are sufficient to satisfy Rule 8.

C.     **Trade Secrets (Counts III and IV)**

Counts III and IV allege trade secret misappropriate in violation of federal and Illinois state law.  See 18 U.S.C. § 1836; 765 ILCS 1065/1.  Defendants move to dismiss these counts on the basis that "Plaintiffs fail to allege any trade secrets with the requisite 'specificity'" and instead "rely on conclusory assertions and vague descriptions of 'information' contained in its software." [22] at 9.

Once again, Defendants are attempting to hold Plaintiffs to a higher standard than Rule 8 requires.  Defendants' "insistence that Plaintiff allege its trade secrets with 'particularity' is not supported by case law or the federal pleadings standards."  *Mission Measurement Corp. v. Blackbaud, Inc*., 216 F. Supp. 3d 915, 921 (N.D. Ill. 2016).  Although "[i]t is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated," trade secrets "need not be disclosed in detail in a complaint alleging misappropriation for the simple reason that such a requirement would result in public disclosure of the purported trade secrets."  *AutoMed Techs., Inc. v. Eller*, 160 F. Supp. 2d 915, 920-21 (N.D. Ill. 2001) (internal citations omitted) (identifying specific software adequate at pleading stage); see also *Prominence Advisors, Inc. v. Dalton*, 2017 WL 6988661, at *3 (N.D. Ill. Dec. 18, 2017) ("a complaint need only identify the alleged trade secret in a general sense").  The complaint [1] satisfies this standard.  It identifies and describes trade secrets including: (i) proprietary and copyright protected software (¶¶ 29, 32, 135, 151); (ii) the access control systems within Philips software (¶¶ 31, 40, 135, 151); (iii) the software tools for enabling optional features within Philips software (*id.* ¶¶ 34, 40, 138-140, 154-156); (iv) Philips onboard software (¶¶ 135, 141); (v) hardware within Philips medical imaging systems (¶¶ 21, 25); (vi) Philips CSIP (¶¶ 35-37); and

(vii) the specific syntax related to the copyright management information within the licensed options file (¶ 107).

Defendants also criticize the sufficiency of the allegations concerning misappropriation, because "[t]here is no allegation that GMI has accessed and decompiled the machine code and thereby gained knowledge of the alleged trade secrets." [22] at 12. However, Defendants ignore the complaint's details concerning the variety of ways that Defendants have obtained and misappropriated Philips' trade secrets by using access keys and other illegal hacking methods to obtain trade secret software tools for enabling optional software and disabling access controls. See [1] at ¶¶ 46-72, 138-42, 154-58.

Defendants also criticize the complaint for failing to "identify any aspects of the software that are not already available and known throughout the industry, including to GMI and any other refurbisher or remarketer." [22] at 9. Defendants claim that "Philips has placed virtually no safeguards on the information it claims is a 'trade secret,' and the information is readily available for access and use by anyone who owns a system" or "who provides repair and refurbishment services." *Id*. However, this argument relies on purported "facts" from outside the pleadings, which is not proper on a motion to dismiss. See *Pittsfield Development, LLC v. Travelers Indemnity Co.*, 542 F. Supp. 3d 791, 797 (N.D. Ill. 2021).

**D.     CFAA (Count V)**

In Count V, Plaintiffs allege that Avante and GMI violated the CFAA, 18 U.S.C. § 1030(a), by "intentionally and/or knowingly access[ing] the software on the computers within Philips ultrasound systems on the ultrasound systems at St. Peters, Beaumont Dearborn, and other locations either without authorization, or in excess of the access granted, or in excess of access

that the ultrasound systems' owners had the rights and ability to confer upon GMI and Avante." [1] at ¶ 166.

Defendants argue "with respect to Beaumont Dearborn Hospital," that "the allegations in the Complaint contradict the notion that GMI accessed the machine without authorization as Philips specifically alleges the GMI representative was working under the observation of a hospital representative" and "there is no allegation that any presets were actually deleted by GMI." [22] at 12-13. Defendants also find it "notable" that "despite being 'onsite,' Philips does not allege that its representative actually observed any change to the machine in question." *Id*. at 13. As for St. Peters Hospital, Defendants point out that "[t]here are no facts indicating when GMI allegedly accessed the machine, how it 'exceeded any authorization,' or even when it sold the machine to the party from whom St. Peters purchased the machine." *Id*.

Defendants again are demanding more than Rule 8 requires. Philips' CFAA claim alleges that Defendants violated §1030(a)(2)(C) 8 by accessing the software on computers within Philips systems at St. Peters, Beaumont Dearborn, and other locations either (i) without authorization, (ii) in excess of the access granted, or (iii) in excess of access that the ultrasound systems' owners had the right and ability to confer upon GMI and Avante by using counterfeit "access keys" and other hacking tools to gain unauthorized access to proprietary software (including software not made available outside of Philips) and to enable unlicensed options (¶¶166-172). Plaintiffs further allege that Defendants violated §1030(a)(4) by obtaining valuable diagnostic and maintenance log files and other valuable proprietary tools and information through their unauthorized access (¶ 173). They also allege a loss in excess of $5,000 "related to the investigation of and cost of responding to the conduct" (¶¶ 174-175). These allegations are sufficient to satisfy Rule 8.

Defendants' other arguments are not properly raised through a Rule 12(b)(6) motion. The Court cannot decide on a motion to dismiss which of competing inferences to draw from the facts alleged, cf. *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2018), nor can it properly evaluate the sufficiency of Plaintiffs' investigation into Defendants' alleged conduct. Plausibility is all that is required, and Plaintiffs satisfy that relatively low bar.

**E.    Tortious Interference with Contract (Count VII) and Civil Conspiracy (Count VIII)**

To state a claim for tortious interference with contract under Illinois law, "a plaintiff must allege facts sufficient to establish: (1) a valid contract, (2) defendant's knowledge of the contract, (3) defendant's intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach of contract caused by defendant's wrongful conduct, and (5) damages." *Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018); see also *Healy v. Metropolitan Pier & Exposition Authority*, 804 F.3d 836, 842 (7th Cir. 2015). Defendants argue that Plaintiffs' tortious interference with contract claim against Avante and GMI is deficient because "no specific contract [is] identified" and neither of the hospitals specifically identified in the complaint (St. Peters and Beaumont Dearborn) are alleged to have purchased their ultrasound systems directly from Philips or to be party to a contract with Philips. [22] at 13-14. Defendants further argue that Plaintiff's civil conspiracy claim against Jordan must be dismissed because Plaintiffs cannot state an underlying claim of tortious interference. See *id.* at 16.

The complaint contains significantly more detail that Defendants' brief acknowledges. The complaint alleges that (i) Philips' customers enter into agreements with Philips when they purchase an ultrasound system and that those agreements include Philips Standard Terms and Conditions of Sale and Philips Software License Agreement (the "Agreements") (¶¶ 194, 203-205); (ii) a third party that purchases a Philips ultrasound system from a Philips' customer agrees to the same terms

(¶¶ 204-205), and (iii) Defendants' customers either purchased systems from Philips or from third parties who purchased the systems from Philips and automatically agreed to be bound by the Agreements with Philips (¶ 207). The Complaint also alleges that Defendants' sale of access keys to its customers intentionally induced Defendants' customers to breach at least the following terms in the Agreements (¶¶ 204, 208-209): (i) using the software for purposes other than the operation of the product (§1.1); (ii) allowing unauthorized persons to use and access the software (§1.4); (iii) modifying the software (§§1.2, 1.3, 2.2); (iv) altering the configuration of the system (§2.2); and (v) using and installing components that have not been certified by Philips (§2.2). The complaint further alleges that Defendants provided access keys to St. Peters Hospital and Beaumont Dearborn Hospital, and Defendants caused them to breach their Agreements with Philips in at least these ways (¶ 210). Plaintiffs plead the same with respect to Defendants' other customers (¶ 211), whom Plaintiffs expect to identify during discovery. These allegations are sufficient to state a claim for tortious interference with contract and also support the civil conspiracy claim against Jordan. See ¶¶ 218-220 (describing Jordan's agreement, including that it knew of GMI and Avante's unlawful methods and hacking tools and agreed to tortiously interfere with the Agreements to profit from the sale of the access keys and the unauthorized access of the systems).

### F.    Unfair Competition (Count IX)

In Count IX of the complaint, Plaintiffs allege that Defendants engaged in unfair competition in violation of Illinois common law. The complaint alleges that "[w]hen entering into contracts with hospitals and health care providers, or other third party service providers, for the repair and maintenance of Philips ultrasound systems, Defendants, by relying on and profiting from their improper and unauthorized access of Philips' proprietary software, trade secrets and Philips CSIP, misrepresent their rights to access/use such proprietary and trade secret information

22

and therefore, their expertise and capabilities to service Philips ultrasound systems." [1] at 50. As a result, Defendants allegedly "have gained an improper competitive advantage over Philips that, inter alia, caused or may cause Philips to be underbid or to otherwise lose out on business that it would have otherwise obtained." *Id.*

Defendants argue that the unfair competition claim must be dismissed because Plaintiffs fail to plead facts from which the Court could infer that any defendant has engaged in unfair trade practices. Defendants point out that the common law tort of unfair competition has been codified in the Uniform Deceptive Trade Practices Act ("UDTPA"), 815 ILCS 510/2, which covers twelve categories of prohibited conduct that all revolve around creating confusion or misunderstanding in consumers regarding the origin or quality of products. See [27] at 16. Defendants conclude that the unfair competition claim must be dismissed because "Philips' unfair competition arguments do not relate to any of those categories." [22] at 15.

In Illinois, "the common law tort of unfair competition encompasses a 'broad spectrum of law,'" making it "difficult to determine exactly what elements are required in order to prove such a claim." *LG Electronics v. Whirlpool Corp.*, 2010 WL 3521785, at *2 (N.D. Ill. Sept. 1, 2010) (quoting *Integrated Genomics, Inc. v. Kyrpides*, 2008 WL 630605, at *13 (N.D. Ill. Mar. 4, 2008)). Defendants are correct that the UDTPA "has codified most aspects of the common law tort of unfair competition." *BlueStar Management v. The Annex Club, LLC*, 2010 WL 2802213, at *9 (N.D. Ill. July 12, 2010) (citing *Custom Business Systems, Inc. v. Boise Cascade Corp.*, 385 N.E.2d 942, 943 (Ill. App. 1979). In addition, however, "courts in this district have recognized that the allegations underlying a claim of tortious interference with prospective economic advantage also suffice to state a claim for unfair competition." *Id.* (citing *Zenith Elec. Corp. v. Exzec, Inc.,* 1997 WL 798907 (N.D. Ill. Dec. 24, 1997)); see also *LG Electronics*, 2010 WL 3521785, at *2;

*Integrated Genomics*, 2008 WL 630605, at *13. Another "form of unfair competition in Illinois is the '[u]nfair appropriation of the property of a competitor.'" *Edge Capture L.L.C. v. Barclays Bank PLC*, 2011 WL 13254424, at *5 (N.D. Ill. Aug. 30, 2011) (quoting *Capitol Records, Inc. v. Spies*, 264 N.E.2d 874, 877 (Ill. App. 1970)). Therefore, "Defendants' contention that a likelihood of confusion as to source must be pled to state a claim for unfair competition is erroneous." *Hycor Corp. v. Dontech, Inc*., 1985 WL 3604, at *3 (N.D. Ill. Oct. 31, 1985). The complaint's allegations sound in both of these alternate theories, which Defendants do not address in their motion to dismiss. Therefore, the motion is denied as to Count IX.

### .G.    Vicarious Liability

Defendants move to dismiss the claims against Jordan on the basis that "Philips has pled no facts establishing that [Jordan] has taken any action or has any legal or ownership relationship with GMI or Avante (it does not)." [22] at 2. However, Defendants' opening brief does not address Plaintiffs' specific allegations concerning vicarious liability or analyze whether they are sufficient to satisfy Rule 8. The complaint [1] alleges that Jordan acquired GMI in 2015 and that, on information and belief, following the acquisition Avante and Jordan "took over control and leadership of GMI and have been funding, overseeing, supervising and directing the business of GMI since it was acquired in October of 2015." *Id*. a ¶ 11. The complaint further alleges on information and belief that Avante and Jordan "knew of GMI's illegal methods, including its use of hacking tools and a counterfeit key generator, and agreed to participate in and fund the wrongful conduct for financial gain." *Id*. More generally, the complaint alleges on information and belief that Jordan has the right and ability to supervise the conduct described in the complaint, is the ultimate financial beneficiary of the wrongful conduct, and knowingly and voluntarily agreed to GMI and Avante's improper conduct to secure a financial gain for itself. *Id.* at ¶ 10. While

Defendants may challenge the truth of these allegations, that is not a basis for dismissing the claims against Jordan. The allegations are assumed to be true for purposes of Defendants' motion to dismiss and provide a plausible basis for vicarious liability, at least in the absence of any argument by Defendants to the contrary.

## IV.  Conclusion

For the reasons explained above, Defendants' motion to dismiss for failure to state a claim [20] and Plaintiffs' motion for leave to file a surreply in opposition [33] are both denied.


Dated: August 4, 2022

Robert M. Dow, Jr.
United States District Judge