IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PHILIPS NORTH AMERICA LLC, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v.  ) | No. 21 C 3615 |
| ) | |
| GLOBAL MEDICAL IMAGING, LLC, *et al.*, ) | Magistrate Judge Finnegan |
| ) | |
| Defendants. ) | |

### ORDER

Plaintiffs Philips North America LLC, Koninklijke Philips N.V., and Philips India Ltd. ("Plaintiffs") have moved for a protective order governing the use of confidential information. (Doc. 45). Defendants Global Medical Imaging, LLC d/b/a Avante Ultrasound, Avante Health Solutions f/k/a Jordan Health Products, LLC, and Jordan Industries International, LLC ("Defendants") agree that a protective order is appropriate; however, the parties are unable to resolve disputes related to certain procedures for (1) giving designated in-house counsel access to highly confidential information; and (2) conducting source code inspections. For reasons set forth in this Order, the Court grants Plaintiffs' motion.

### DISCUSSION

**I.  Good Cause**

The party moving for a protective order is required to show that good cause exists to enter the protective order. FED. R. CIV. P. 26(c). "Good cause . . . generally signifies a sound basis or legitimate need to take judicial action." *Hobley v. Chicago Police Commander Burge*, 225 F.R.D. 221, 224 (N.D. Ill. 2004). Here, the parties agree that a

protective order should be entered and that, as competitors, they "should not have access to each other's competitively sensitive information" and are best served by a multi-tiered order designating documents as either "Confidential," "Highly Confidential," or "Highly Confidential – Source Code." (Doc. 46, at 6; Doc. 55, at 6). Such protective orders are standard in cases involving trade secrets, and the Court finds good cause for the entry of a protective order to shield the parties' confidential information.

## II.   In-House Counsel's Access to Highly Confidential Information

### A.   Agreed Process in Protective Order

The parties agree that one designated in-house counsel may have access to materials designated Highly Confidential. (*See* Doc. 46, at 7; Doc. 55, at 11). They also agree on the process to be followed before access is granted to that counsel. Initially, a party must make a request to the opposing party to provide access, indicating (in writing) the full name of the designated in-house counsel and "current and reasonably foreseeable future primary job duties and responsibilities in sufficient detail to determine present or potential involvement in any *Competitive Decision-Making* for the medical imaging devices at issue in this lawsuit." (Doc. 90-5, at ¶ 5(c)(i)) (emphasis added).[1] After doing so, the requesting party "may disclose the designated material to the identified in-house counsel unless, within seven (7) days of delivering the request, the Party receives a written objection from the designator providing reasonably detailed grounds for the objection." (*Id.* at ¶ 5(c)(ii)).[2] If an objection is made, and the requesting party opts to

---

[1] Clean and red-lined copies of various versions of the Protective Order are attached as exhibits to a joint status report. (Doc. 90). The version referenced in this order is a redline of Plaintiffs' proposed protective order against Defendants' proposed protective order identifying the provisions in dispute. (Doc. 90-5).

[2] Defendants' version of the Protective Order adds the word "reasonably" before the words "detailed grounds." (Doc. 90-5, at ¶ 5(c)(ii)). It appears Plaintiffs have agreed to this modest change since their

challenge it, the parties must meet and confer in an effort to resolve the objection. If they are unable to do so, the designated in-house counsel "shall not receive any Highly Confidential material until the Court resolves the dispute." (*Id*. at ¶ 5(c)(iii)).[3]

### B. Competitive Decision-Making

Despite agreeing to the above process, the parties disagree about whether (and how) to define the term "Competitive Decision-Making" referenced in paragraph 5 of the Protective Order. As Plaintiffs argue, "competitive decision making is a term of art" and what constitutes such decision-making here depends on the "specific issues in the case and the proposed designated in house counsel's duties and responsibilities 'in light of similar or corresponding information about a competitor.'" (Doc. 46, at 7) (citing *U.S. Steel Corp. v. United States,* 730 F.2d 1465, 1468, n.3 (Fed. Cir. 1984)).

In *U.S. Steel,* the Federal Circuit considered an appeal of an order denying in-house counsel access to confidential information based solely on counsel's in-house position due to the perceived "greater risk of inadvertent disclosure within the corporate setting." 730 F.2d at 1467. The lower court had entered the order after concluding that it was "humanly impossible to control the inadvertent disclosure of some of [the highly confidential] information in any prolonged working relationship" given the great quantity of "extremely potent" information that was "intermixed with nonconfidential information[.]" *Id*.

---

motion did not address it, and the Court sees no basis for them to object. The final Protective Order submitted for entry by the Court should include this change.

[3]  The Court construes this to mean that if the parties cannot resolve the objection, the designated in-house counsel "shall not receive any Highly Confidential material until [and unless] the Court resolves the dispute [and allows that counsel to receive such material.]" The final Protective Order submitted for entry by the Court should include the bracketed words so it is clear that if the Court resolves the dispute in a way that denies designated in-house counsel access to Highly Confidential material, then the receiving party may not provide access.

In overturning that order, the Federal Circuit observed that "[w]hether an unacceptable opportunity for inadvertent disclosure exists … must be determined … by the facts on a counsel-by-counsel basis, and cannot be determined solely by giving controlling weight to the classification of counsel as in-house rather than retained." *Id*. at 1468. To determine the extent of the risk, courts must therefore consider "the factual circumstances surrounding each individual counsel's activities, association, and relationship with a party, whether counsel be in-house or retained . . ." *Id.* In assessing this, the *U.S. Steel* court further indicated that a key inquiry is whether counsel is involved in competitive decision-making, and explained what it meant by that term:

> The parties have referred to involvement in "competitive decisionmaking" as a basis for denial of access. The phrase would appear serviceable as shorthand for a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) *made in light of similar or corresponding information about a competitor*.

*Id.* at 1468, n.3 (emphasis added). *See also Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir.1992) ("A crucial factor in the *U.S. Steel* case was whether in-house counsel was involved in 'competitive decisionmaking[.]'"); *DSM Desotech, Inc. v. Momentive Specialty Chemicals, Inc.*, No. 2:15-CV-70, 2016 WL 8193590, at *8 (S.D. Ohio May 31, 2016) (counsel's status as a "competitive decisionmaker … is the most critical factor in assessing the risk of inadvertent disclosure.").

The definition of competitive decision-making in *U.S. Steel* was not meant to be limited to client decisions involving pricing and product design. As the court observed in *Cummins-Allison Corp. v. Glory Ltd.,* No. 02 C 7008, 2003 WL 26620151 (N.D. Ill. Dec. 31, 2003), "[t]he [*U.S. Steel*] court's use of 'etc.' reveals that those are only examples of the kinds of client decisions that may be made 'in light of similar or corresponding

information about a competitor.'" *Id*. at *6. *See also DSM Desotech, supra* at *6 (quoting *In re Deutsche Bank Trust Co. Am.*, 605 F.3d 1373, 1378-79 (Fed. Cir. 2010)) ("The Federal Circuit subsequently made clear that the foregoing definition contained 'specific exemplars of activity involving competitive decisionmaking,' but did not, as subsequent opinions have recognized, contain an exhaustive list of activities that might implicate or involve competitive decisionmaking.").

Where a court determines from the particular facts in a case that there is a risk of inadvertent disclosure due to designated counsel's involvement in competitive decision-making and/or other circumstances, then an additional inquiry is necessary. The court must next "assess whether this risk of inadvertent disclosure outweighs the risk of potential harm" from precluding designated counsel from reviewing the highly confidential materials. *DSM Desotech*, *supra* at *8 (citing *In re Deutsche Bank*, 605 F.3d at 1380) ("A determination of the risk of inadvertent disclosure does not end the inquiry. Even if a district court is satisfied that such a risk exists, the district court must balance this risk against the potential harm to the opposing party from restrictions imposed on that party's right to have the benefit of counsel of its choice."). *See also Brown Bag Software*, 960 F.2d at 1470 (Court "must balance the risk … of inadvertent disclosure of trade secrets to competitors against the risk … that protection of … trade secrets" will impair a party's ability to prosecute its claims).

Here, the Court has not yet undertaken the above analysis to decide whether a particular in-house attorney engages in competitive decision-making, and if so, whether a balancing of harms requires the Court to restrict that attorney's access to highly confidential information or impose other restrictions. Not only does the Court lack the

necessary factual information to perform this analysis, but it would be premature to do so given the agreed process in the Protective Order; the parties have not yet exchanged the required information about their respective designated in-house counsel and conferred about any objection to these individuals.

### C. Disputed Definitions and Ruling

What the Court must decide at this juncture is only whether to include a definition of competitive decision-making in the Protective Order, and if so, whether the definition suggested by Defendants is acceptable. While Defendants contend it is critical to include their definition, the Court is not persuaded. First, and to the Court's surprise, Defendants attempt to demonstrate the need for their particular definition by prematurely arguing that "The Risk and Potential Injury to Defendants from Inadvertent Disclosure Far Outweighs Any Potential Impairment in Philips' Ability to Bring its Case." (Doc. 55, at 9-11). (*See also id.* at 7) ("Upon weighing this risk [of potential misuse of Defendants' Highly Confidential Information] against the absence of any identified impairment to Philips' ability to litigate its case, [their] definition should be adopted.").

These arguments lend credence to Plaintiffs' assertion that Defendants are seeking through their proposed definition to "presumptively exclude [Plaintiffs'] proposed in-house counsel without any briefing or the specificity required for the Court to determine if [that counsel] is in fact a competitive decisionmaker in the context of this lawsuit and the highly confidential information that Defendants would produce in this lawsuit." (Doc. 64, at 3). Obviously, this Court cannot decide whether competitive decision-making is involved or conduct any balancing of harms without the type of case-specific information described in *U.S. Steel* and considered in other cases. To make findings in a vacuum as

Defendants suggest, and then use those findings as justification for adopting a particular definition of competitive decision-making, would be backward and contrary to the teaching of *U.S. Steel*.

Wholly apart from this problem, the Court also rejects Defendants' proposed definition because it appears flawed on its face. They define the term this way:

> "Competitive Decision-Making" means business decision-making relating to a competitor, potential competitor, customer, or distribution partner including decisions regarding pricing, marketing, design, product or service offerings, product or service development or research and development, or licensing, acquisition, or enforcement of intellectual property rights.

(Doc. 90-3, at ¶ 3(d)). Notably, Defendants have omitted key language appearing in the *U.S. Steel* definition, namely, that competitive decision-making (on pricing or other subjects) is decision-making "made in light of similar or corresponding information about a competitor." 730 F.2d at 1468, n.3. By omitting this clause, competitive decision-making could be broadly construed to cover *all* business decisions relating to customers, including about product or service offerings, marketing, etc., even if the decisions are *not* made in light of similar or corresponding information about a competitor.

Defendants claim their definition "has been used in other cases to account for potential misuse by a competitor" but do not cite other cases – only language in a single and *stipulated* protective order entered in an unrelated case in which no court issued any decision. (Doc. 55, at 5, n.2) (citing Stipulated Protective Order, *United States v. Google*, No. 1:20-CV-3010 (D.D.C. Dec. 21, 2020), found at https://www.justice.gov/atr/case-document/file/1428256/download (last visited November 17, 2022)). Defendants also argue that *U.S. Steel* does not preclude their definition, "which simply incorporates activities courts have found constitute competitive decision-making." (*Id*. at 9). For

example, their definition includes "research and development, and the licensing, acquisition, and/or enforcement of intellectual property rights" based on legal decisions where counsel involved in such activities were found to be engaged in competitive decision-making. (*Id*. at 8) (citing *Intel Corp. v. VIA Techs., Inc.*, 198 F.R.D. 525, 529-30 (N.D. Cal. 2000); *Pinterest, Inc. v. Pintrips, Inc.*, No. 13-CV-04608-RS (KAW), 2014 WL 5364263, at *2 (N.D. Cal. Oct. 21, 2014); and *Nike, Inc. v. Adidas Am. Inc.*, No. 9:06-CV-43, 2006 WL 8430978, at *2 (E.D. Tex. Sept. 21, 2006)).

But as Plaintiffs observe, in these decisions each court "made a determination about a specific individual, his specific job duties and the specific risks that could result from access to highly confidential information in the context of allegations specific to the case *after* the Court received and considered evidence." (Doc. 64, at 3) (emphasis in original). This Court has not yet been given such evidence, and so is unable and unwilling to presume in this case that any attorney engaged in enforcement of intellectual property rights is necessarily involved in competitive decision-making. This must be determined "on a case-by-case basis." *DSM Desotech, Inc.*, supra at *6 (citing *In re Deutsche Bank*, 605 F.3d at 1379).[4]

---

[4] Put another way, the facts are what matter rather than the category of decision-making:

> Because patent prosecution is not a one-dimensional endeavor and can encompass a range of activities, it is shortsighted to conclude that every patent prosecution attorney is necessarily involved in competitive decisionmaking. Indeed, "denying access to [a party's] outside counsel on the ground that they also prosecute patents for [that party] is the type of generalization counseled against in *U.S. Steel*. The facts, not the category must inform the result. Our holding in *U.S. Steel* dictates that each case should be decided based on the specific facts involved therein."

*In re Deutsche Bank*, 605 F.3d at 1379 (quoting *In re Sibia Neurosciences, Inc.*, 132 F.3d 50, 1997 WL 688174, at *3 (Fed. Cir. 1997)).

Nor is there a need for the definition in the Protective Order. After all, this is not a case where the parties have agreed that they may unilaterally decide – based on the definition of competitive decision-making appearing in that Order – whether designated in-house counsel is involved in such decision-making and so is permitted access to Highly Confidential Information. Rather, the parties have agreed to a process where they must exchange information about the designated in-house attorney (including potential involvement in competitive decision-making for the medical imaging devices at issue in the lawsuit), and if they cannot agree on whether the attorney may be given access, the Court resolves the issue. Given this, the Court agrees with Plaintiffs that "a definition would only uproot the requirements of *U.S. Steel* and *Brown Bag* to engage in the particularized inquiry and analysis necessary to apply that term to this case." (Doc. 64, at 3).

In addition, adoption of the proposed definition may well lead to confusion since the definition is incorporated into another disputed term: "Designated In-House Counsel." Defendants define that term as follows:

> "Designated In-House Counsel" shall mean, subject to the disclosure requirements in Section 5(c)(i)-(iii), one in house counsel of the Party *who does not currently exercise any Competitive Decision-Making* on behalf of the Party whom counsel represents and who has signed an undertaking in the form of Appendix 1 to this Order and provided a copy to counsel for the opposing Party.

(Doc. 90-3, at ¶ 3(c)) (emphasis added). Proposed Appendix 1 (a form entitled "In-House Litigation Counsel Agreement Concerning Confidentiality") requires counsel to certify that "I do not currently exercise any Competitive Decision-Making authority, *as defined in the protective order* … and will not exercise any Competitive Decision-Making for a period of

one (1) year after the conclusion of this litigation, including appeals." (*Id.* at 24) (emphasis added).

What happens, however, if the Court finds after a hearing and consideration of all the case-specific facts, that a particular attorney is *not* involved in competitive decision-making so may access highly confidential information? Under Defendants' version of the Protective Order, that attorney would nevertheless be unable to review that information until and unless he certified that he was not engaged in competitive decision-making as defined in that Order. Given the breadth and vagueness of the definition, it is possible that the attorney could not so certify. In this Court's view, if a specific attorney has been found *not* to be engaged in competitive decision-making based on the Court's consideration of all the specific facts in the case (or been granted access despite such decision-making after a balancing of harms), there is no justification for imposing the certification requirement that Defendants seek.

For all of these reasons, the Court declines to include any definition of competitive decision-making (and certainly not Defendants' flawed definition) in the Protective Order. As for the definition of "Designated In-House Counsel," the Court adopts Plaintiffs' definition: "subject to the disclosure requirements in Section 5(c)(i)-(iii), one in house counsel of the receiving party to whom disclosure is reasonably necessary for this litigation and who has signed the "Acknowledgement and Agreement to Be Bound" (Appendix 1)." (Doc. 90-1 at ¶ 3(c)). However, the content of the Acknowledgment must be modified to correct certain errors, as well as to add language requiring Designated In-House Counsel to provide prompt notification of any change in decision-making

responsibilities as this may affect counsel's continued access to Highly Confidential Information.[5]

## III. Source Code Inspections

The parties also disagree about certain provisions of the proposed Protective Order that describe procedures relating to inspection of source code.

### A. Second Computer

Paragraph six of the Protective Order acknowledges that source code is relevant to the issues in the case, and that "special procedures are appropriate to protect the confidentiality of source code." (Doc. 90-5, at ¶ 6(a)). If materials defined as "Highly Confidential-Source Code" are made available for inspection in response to a discovery request, the Producing Party must load the source code onto a computer meeting certain specifications for review in native format (to the extent reasonably available). (*Id.* at ¶ 6(a)(i)). The Order also specifies acceptable locations where the computer must be made available for "a reasonable number of days during normal business hours (9:00 a.m. to 5:00 p.m. on open business days) or at other mutually agreeable times." (*Id.*).

Notably for purposes of the current dispute, paragraph 6(a)(i) goes on to state: "A Receiving Party may request, in writing, additional computers for inspecting the material designated Highly Confidential-Source Code, and the Producing Party *shall meet and confer about any such request, and to the extent practicable, reasonably accommodate*

---

[5] Plaintiffs' Appendix I (entitled "Undertaking of [insert name]") indicates that it is for retained experts and consultants rather than Designated In-House counsel. The person signing (under penalty of perjury) affirms that she has or will be receiving information subject to the Protective Order and has read and will abide by that order. (Doc. 90-1, at 23). It is premature to decide whether counsel should be required to certify that she will not exercise any competitive decision-making for one year after the conclusion of the litigation (including appeals) as Defendants propose. That determination must be made as part of the balancing of harms analysis that will occur if the parties are unable to reach agreement on who may serve as Designated In-House counsel for each side.

*such requests.*" (*Id.*) (emphasis added). Defendants object to the italicized words, seeking to replace them with the words below, so that the Producing Party:

> shall make at least one (1) additional computer available for the inspection of material designated Highly Confidential-Source Code, consistent with the other conditions in this paragraph, within seven (7) days of a written request for an additional computer. If the Producing Party reasonably believes that the current status of the ongoing Covid-19 pandemic prevents the Producer from satisfying its obligations in this paragraph, the Parties shall meet and confer to suggest and adopt potential modifications.

(*Id.*).

Plaintiffs complain that if these changes were adopted, the Protective Order would impose "an obligation to provide multiple source code computers on short notice without any requirement that Defendants provide a reasonable basis for their demand that Philips incur the burden and expense associated with creating, transporting and securing an extra source code computer." (Doc. 64, at 1). This Court agrees and declines to adopt an automatic 7-day rule that may not be practical or necessary depending on the circumstances that present themselves at some future time. To the extent Defendants ultimately determine there is a need for a second computer and request one, the Protective Order provides a fair process for the parties to discuss the issue, and flexibility in attempting to accommodate the request. If the process appears to take too long, or a party is unhappy with the outcome, that party may seek relief from the Court under the language in Plaintiffs' proposed order.

### B. Storage of Scripts, Data, Tools on Inspection Computers

The parties have agreed to other procedures surrounding the inspection of source code to ensure, for example, that the Receiving Party's outside counsel and/or expert does not leave any work product or attorney-client privileged information in the location

where the source code computer is examined. (Doc. 90-5, at ¶ 6(a)(viii)). Defendants ask the Court to add the following additional provision: "However, the Receiving Party's experts shall have the right to store scripts and data output by those scripts or other tools on the computer on which the inspection is being conducted for the purpose of expediting future inspections of the material designated Highly Confidential–Source Code." (*Id*.). Defendants argue this language should be included as it "relieves its experts from having to write duplicative code scripts at the outset of each review session to isolate the relevant portions of the code for review[,]" and so allows the inspection of source code to be expedited given the "practical limitations on the time both parties have to finish" the review. (Doc. 55, at 14, 15).

Plaintiffs strenuously object to this provision as "highly atypical" in contrast to the "standard" language that they propose. (Doc. 46, at 12-13). They describe this "standard" procedure as follows: "The receiving party goes in person to review source code on a secure computer, takes notes, identifies sections/folders for printout and removes all notes when he/she leaves." (*Id*. at 13).[6] Plaintiffs contend that adoption of Defendants' additional provision would "allow opposing counsel to store unidentified scripts or other unidentified tools on a protected source code computer" and so "undermine[ ] the security of the source code computer and create[ ] a serious risk of copying or other disclosure." (*Id*.) (citing *Generac Power Sys., Inc. v. Kohler Co.*, No. 11 C 1120, 2012 WL 2049945, at *2 (E.D. Wis. June 6, 2012) (recognizing that "[s]ource code for programs is often one of the most valuable assets a company possesses."); and *Berkheimer v. Hewlett-Packard*

---

[6] Plaintiffs say their proposed protective order "is not just consistent with the Local Patent Order, but it is consistent with Protective Orders Philips has filed (and which Courts have approved) in other cases that involved the same type of conduct, systems and software." (Doc. 64, at 2, n.1) (citing *Philips N. Am., LLC v. Summit Imaging Inc.*, No. 2:19-CV-01745-JLR, Dkt. No. 40 (W.D. Wash. Apr. 30, 2020)).

*Co.*, No. 12 C 9023, 2014 WL 12959469, at 3 (N.D. Ill. Apr. 7, 2014) (finding that "convenience-based arguments do not outweigh Defendant's legitimate concerns regarding inadvertent disclosure of its highly confidential and highly valuable source code.")).

Defendants, on the other hand, argue that any concerns about the security of the source code or its inadvertent disclosure are illusory given other and undisputed portions of the protective order (e.g., the computer will not be connected to any network and use of recordable media or devices is precluded). (Doc. 55, at 14-15). Yet Defendants did not identify a single protective order in a case involving source code inspections in which the provision that they propose appears. Nor did they quarrel with the statement in Plaintiffs' motion that such a provision is "highly atypical" in contrast to the "standard" provision that Plaintiffs included. If the procedure identified by Defendants indeed expedites the inspection process without any countervailing security risk, the Court would expect its adoption to be commonplace in cases requiring production of source code.[7]

The Court declines to adopt the provision sought by Defendants. With the minimal information provided, the Court is unable to confirm the claim that there is "no plausible risk" to the source code from adoption of the atypical procedure. (Doc. 55, at 15). Instead, it seems at least possible that allowing experts to store and use unidentified tools and scripts on a source code computer could create security concerns for extremely valuable source code. Moreover, one of the agreed terms of the Protective Order already requires

---

[7] In their motion and reply brief, Plaintiffs assert that defense counsel requested this same atypical provision in a protective order in another lawsuit involving Philips and the court rejected it. (Doc. 46, at 13, n.3; Doc. 64, at 6, citing *Philips Med. Sys. Nederland B.V. v. TEC Holdings, Inc.*, No. 3:20-CV-021-MOC-DCK, Dkt. No. 340, at 20-21 (W.D.N.C. Mar. 31, 2021). Defendants did not address this claim in their opposition brief.

the Producing Party to "promptly install any tools requested by the Receiving Party that are reasonably necessary for reviewing and searching the code produced on the computer." (Doc. 90-5, at ¶ 6(a)(ii)). And as Plaintiffs acknowledge, the Protective Order "does not limit an expert's ability to return – for however many days is reasonably necessary – to complete his or her inspection . . ." (Doc. 46, at 13). On balance, the Court is not persuaded that there is sufficient justification for the provision that Defendants seek for the convenience of their expert to speed the review of source code.

C.  **Source Code Printouts**

The final dispute is over printouts of source code. By agreement, the proposed Protective Order requires that the receiving party "may not request more than fifty (50) pages of a continuous block or five hundred (500) total pages of Source Code from each Producing Party in this litigation without prior written approval by the Producing Party or Order of the Court." (Doc. 90-5, at ¶ 6(a)(iv)). What is in dispute is the following sentence that Defendants ask to be removed: "Requests for printing continuous blocks of source code exceeding 50 pages or requests for printing over 500 total pages of source code from a Producing Party in this litigation are presumed unreasonable." (*Id.*).

Plaintiffs say the purpose of the disputed language is "to establish a base line presumption of reasonableness if a party moves for an order to request more." (Doc. 46, at 14). As they see it, this presumption and the limits on printed portions of source code "are both appropriate and standard" given the sensitivity of source code. (*Id.*). Defendants argue the presumption is unnecessary given the requirement that the Receiving Party obtain either prior written approval of the Producing Party or a court order before it may request printouts of more than 50 pages of continuous block or 500 total

pages of source code. They fear that "inclusion of any presumption would compel the Court to always weigh against disclosure in all cases, rather than consider the benefit and costs of such printouts on a case-by-case basis." (Doc. 55, at 15).

Given the sensitivity of source code material, there is good reason for a presumption that requests for printing over 50 pages of continuous blocks of source code or over 500 total pages are unreasonable. Of course, this presumption is rebuttable, so if the Receiving Party's request for a large number of printouts of source code is denied, that party may seek Court review and present specific information about why the request should be granted.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for protective order is granted. The parties are ordered to submit a revised version of the Protective Order reflecting the Court's rulings so it may be entered.

ENTER:

Dated: November 17, 2022

_____
SHEILA FINNEGAN
United States Magistrate Judge