**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PHILIPS NORTH AMERICA LLC, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 21-cv-3615 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| GLOBAL MEDICAL IMAGING, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case is a dispute about business practices for ultrasound machines. Philips is a leading manufacturer of ultrasound machines, and has developed proprietary software to run the machines and provide the functionality selected by the customer. The machines work great, until they don't.

Sometimes the machines run into trouble and need repair. Philips offers repair services to its customers. But other companies can service the machines, too. Global Medical Imaging ("GMI") is a service provider for medical equipment, including ultrasound machines. GMI competes with Philips for the service business.

Philips filed suit against GMI, accusing the company of hacking into its software, selling counterfeit products, and stealing its intellectual property. The complaint survived a motion to dismiss. GMI, in turn, filed fourteen counterclaims, including an assortment of antitrust claims. Philips responded by moving to dismiss the counterclaims.

For the following reasons, this Court grants in part and denies in part the motion to dismiss the counterclaims.

**Background**

The case involves a few Philips entities, including Philips North America LLC, Koninklijke Philips N.V., and Philips India Ltd. For the sake of simplicity, the Court will refer to them collectively as "Philips."

Philips is a leader in the industry for medical imaging systems used at hospitals and medical centers. *See* Cplt., at ¶ 1 (Dckt. No. 1); Counterclaims, at ¶ 11 (Dckt. No. 98). The term "medical imaging" refers to technology that helps doctors view the human body.[1] Ultrasound imaging falls into that category. *See* Counterclaims, at ¶ 11.

Philips develops, manufactures, sells, and services ultrasound systems. *See* Cplt., at ¶ 1; Counterclaims, at ¶ 11. Philips is involved in every phase of an ultrasound system's lifetime. *See* Cplt., at ¶ 1; Counterclaims, at ¶ 11.

The systems include Philips's proprietary hardware and software, which are necessary to operate, service, and repair Philips's systems. *See* Cplt., at ¶ 1. Philips's proprietary software enables certain functions on the ultrasound systems. *Id.*

Not every Philips ultrasound system works the same way. Customers have the option to purchase certain features. *Id.* at ¶ 33.

Each specific ultrasound system includes certain software and hardware features. Customers can use those licensable features only when Philips enables them. *Id.* That is, for each ultrasound system that it sells, Philips enables only the licensed features and tools, and nothing else. *Id.* And only the specific authorized users of the machine can access the enabled features and software options. *Id.*

---

[1] *See Medical Imaging*, FDA (Aug. 28, 2018), https://www.fda.gov/radiation-emitting-products/radiation-emitting-products-and-procedures/medical-imaging.

Philips's optional licensable features control access to Philips's proprietary software, and limit the options available on each specific ultrasound system. *Id.* at ¶ 34. An ultrasound machine will not perform a function unless the customer paid for that feature. *Id.* It sounds a little like an à la carte menu – you get what you pay for, and you have to pay for what you get.

Some ultrasound systems perform more functions than others. It all depends on what the customer signs up for. *Id.* Philips's proprietary software is what enables or disables those features. *See* Cplt., at ¶¶ 25, 27.

Ultrasound machines are pricey. The most expensive machines cost $170,000. *See* Counterclaims, at ¶ 18.

Given the price tag, when an ultrasound machine starts to sputter, a hospital might not want to trade it in for a brand new one. *Id.* The hospital might opt for repairs. *Id.* at ¶¶ 18–19.

Philips provides repair services to its systems. *Id.* at ¶ 11. The systems require an electronic "key" to service. *Id.* at ¶ 43. An engineer can't service the system without the key. *Id.* at ¶ 44. And Philips keeps the keys for itself. *Id.* at ¶ 43.

Other companies are in the business of servicing medical equipment, too. They want to compete with Philips for repair services for ultrasound machines. *Id.* at ¶ 4.

GMI is one of those companies. *Id.* at ¶¶ 3–4. It is an independent service organization. *Id.* at ¶ 3. It repairs ultrasound systems manufactured by Philips. *Id.* at ¶ 4.

Philips filed this lawsuit against GMI and two other defendants, Jordan Health Products, LLC and Jordan Industries International, LLC. Again, for the sake of simplicity, the Court will simply refer to all three Defendants as "GMI."

As Philips sees things, GMI is getting a piece of the action by engaging in unlawful competition. Philips accuses GMI of hacking into its software, misappropriating its intellectual

property, offering counterfeit products, and making false representations to customers. *Id.* at ¶¶ 4–6.

The complaint alleges that GMI uses "hacking tools, including on information and belief a counterfeit key generator, to illegally and without Philips's consent hack Philips's proprietary software to modify, tamper with and alter Philips ultrasound systems to enable unlicensed software features and to sell the modified Philips ultrasound systems with the unlicensed features for a profit and to service and repair Philips ultrasound systems." *Id.* at ¶ 4.

The complaint breaks down the allegations into three parts. *Id.* at ¶¶ 47, 53, 58.

First, Philips alleges that GMI hacked Philips's software. *Id.* at ¶¶ 47, 49. Once inside, GMI altered the software. *Id.* at ¶ 49. It enabled combinations of features that Philips does not sell. *Id.* at ¶ 50. Then GMI sold the modified machines. *Id.* at ¶ 47.

Second, Philips alleges that GMI illegally developed a counterfeit key generator. *Id.* at ¶ 53. The counterfeit keys allegedly let third parties unlock Philips's software. *Id.* at ¶ 56. GMI sells the keys to third parties. *Id.* at ¶ 57.

Finally, Philips alleges that GMI uses the counterfeit keys itself. *Id.* at ¶ 58. The counterfeit keys allow GMI to service the ultrasound machines. *Id.* at ¶ 59. When GMI services the machines, it takes business away from Philips. *Id.*

Philips filed a complaint with 10 counts, including claims for copyright infringement, trade secrets misappropriation, and unfair competition. *Id.* at ¶¶ 73–228.

GMI moved to dismiss. *See* Defs.' Mtn. to Dismiss (Dckt. No. 20). Judge Dow (this Court's predecessor, before reassignment) denied the motion. *See* 8/4/22 Order (Dckt. No. 94).

GMI later filed an answer and asserted 14 counterclaims. *See* Counterclaims (Dckt. No. 98).

4

In essence, GMI alleges that Philips is engaged in monopolistic behavior. *Id.* at ¶ 1. According to GMI, Philips wants to "eliminate competition" in the ultrasound system service market. *Id.*

A few different themes run through the counterclaims.

First, GMI alleges that Philips locks out service providers. Philips has put locks on its service systems for a long time. *Id.* at ¶ 26. For years, its "service access lockout features" made it hard for anyone other than Philips to repair a machine. *Id.*

The locks weren't pick-proof. Despite the features, many service competitors accessed the system and provided "competitive service." *Id.* Philips knew that competitors were wriggling in. *Id.* at ¶ 27. They didn't stop it. *Id.*

But things changed. In 2019, Philips rolled out a new software – version 6.0. *Id.* at ¶ 28. The software introduced "new" technological lockouts. *Id.*

Apparently, the new locks worked better than the old ones. They prevented non-Philips engineers from accessing the service platform. *Id.* As GMI sees things, Philips designed the software to "foreclose all service competitors." *Id.* at ¶ 48.

GMI says that the change hurt customers. *Id.* at ¶ 50. Customers now pay "higher prices" for service. *Id.* They endure "lower service levels," too. *Id.* In other words, customers paid more for less service.

Second, GMI alleges a refusal to deal. According to GMI, Philips gave the company the cold shoulder, and refused to deal with GMI. *Id.* at ¶¶ 54–56. Specifically, Philips ignores GMI's need for the "key." *Id.* at ¶ 56.

5

GMI says that the key is an "essential facility" for ultrasound service. *Id.* GMI can't get the key anywhere else. *Id.* And it can't service the machines without the key. *Id.* But Philips won't play ball. *Id.* So GMI is left out in the cold.

Third, GMI alleges that Philips has manipulated the market for used parts for ultrasound machines. Philips squeezes GMI in the refurbished parts market. *Id.* at ¶¶ 57–59.

GMI offers refurbished parts for ultrasound machines. *Id.* at ¶ 57. But Philips has campaigned to "reduce the supply of used parts." *Id.* at ¶ 58. It has manipulated trade-in values. *Id.*

If a customer has a used part, Philips offers the customer a premium for the part. *Id.* So, the number of used parts in the market has dropped. *Id.* The supply has gone down, because customers traded in the used parts to Philips. *Id.*

Based on the law of supply and demand, the reduction in supply led to an increase in price. The supply squeeze means that GMI and other independent service organizations must pay more for a used part. *Id.* It costs more for them to do business. *Id.*

Fourth, GMI accuses Philips of using litigation to retain its dominance. As GMI sees it, Philips has waged an "abusive litigation campaign" to "injure" and "intimidate" its independent service organization competitors. *Id.* at ¶ 60.

The complaint points to ten lawsuits that Philips has filed against independent service organizations in federal district courts across the country. *Id.* at ¶¶ 60–61. In essence, GMI alleges that the lawsuits are an attempt to bully independent organizations away from exercising their "rights to repair" Philips's medical systems. *Id.* at ¶ 62.

Finally, GMI gives an example of Philips interfering with GMI's relationship with a customer, Beaumont Hospital. *Id.* at ¶ 63.

6

Philips had a full-service contract with Beaumont Hospital.  *Id.*  But Beaumont ended its relationship with Philips at the end of 2020.  *Id.*  Beaumont gave the business to GMI.  *Id.*

One month into that relationship, one of Beaumont's ultrasound systems had a problem.  *Id.* at ¶ 64.  Beaumont called GMI for help.  *Id.*  GMI ordered a replacement part and installed it.  *Id.* at ¶ 65.

The system had more problems.  *Id.* at ¶ 67.  This time, Beaumont didn't call GMI.  *Id.*  Beaumont reached out to a Philips field service engineer.  *Id.*

Philips's engineer responded.  *Id.* at ¶ 69.  He told Beaumont that GMI had installed counterfeit parts.  *Id.*  He also told Beaumont that GMI violated HIPAA when it removed a hard drive with patient information.  *Id.*

GMI says that the statements were lies.  *Id.* at ¶ 70.  But Beaumont fell for them.  *Id.* at ¶¶ 71–72.  Philips's "disparagement" caused GMI to lose future work.  *Id.*

Based on those core allegations, GMI filed 14 counterclaims.  *Id.* at ¶¶ 78–234.

The first five counts seek a declaratory judgment.  Basically, GMI seeks a declaration that it did not violate this or that, or requests a declaration that Philips is in the wrong.

Specifically, GMI seeks a declaration that it did not violate the Digital Millennium Copyright Act (Count I), and did not violate the Computer Fraud and Abuse Act (Count II).  *Id.* at ¶¶ 78–102.  GMI also requests a declaration that Philips misused its copyrights (Count III), and that GMI acted within the scope of Philips's License Agreements (Count IV).  *Id.* at ¶¶ 103–26.  Finally, GMI asks for a declaration that GMI did not violate the Defend Trade Secrets Act or the Illinois Trade Secrets Act.  *Id.* at ¶¶ 127–42.

The next count challenges this litigation itself. Count VI alleges that Philips filed this lawsuit in bad faith, in violation of the Defend Trade Secrets Act and the Illinois Trade Secrets Act. *Id.* at ¶¶ 143–53.

The next four counts allege antitrust violations (Counts VII to X). GMI brings monopolization and attempted monopolization claims under the Sherman Act and the Illinois Antitrust Act. *Id.* at ¶¶ 154–212.

Finally, GMI wraps up its counterclaims with four claims under state law. GMI brings two tortious interference claims, including tortious interference with contract (Count XI) and tortious interference with prospective economic advantage (Count XII). *Id.* at ¶¶ 213–26. GMI also brings a claim under the Illinois Uniform Deceptive Trade Practices Act (Count XIII). *Id.* at ¶¶ 227–31. The last count is a common law unfair competition claim (Count XIV). *Id.* at ¶¶ 232–34.

Philips moved to dismiss each counterclaim. *See* Philips's Mtn. to Dismiss (Dckt. No. 104).

### Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). When considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive a Rule 12(b)(6) motion, the complaint or counterclaim must give the other party fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A

8

claim has facial plausibility" when the complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Iqbal*, 556 U.S. at 678.

**Analysis**

The Court will start with the antitrust counterclaims. Then, the Court will turn to the counterclaims that seek a declaratory judgment, before ending with the remaining counterclaims.

## I. Antitrust Counterclaims

GMI advanced four antitrust counterclaims. The first two counterclaims allege monopolization and attempted monopolization under the Sherman Act. *See* Counterclaims, at ¶¶ 154–82 (Dckt. No. 98); *see also* 15 U.S.C. § 2. The next two counterclaims allege monopolization and attempted monopolization under the Illinois Antitrust Act. *See* Counterclaims, at ¶¶ 183–212; *see also* 740 Ill. Comp. Stat. Ann. 10/3(3).

When it comes to antitrust law, federal law and Illinois law are on all fours. Illinois modeled section 3(3) of the Illinois Antitrust Act after section 2 of the Sherman Act. *See Illinois ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1479–80 (7th Cir. 1991). Illinois law also "provides that its courts should use the construction of federal antitrust law by federal courts to guide their construction of those state antitrust laws that are substantially similar to federal antitrust law." *Id.* at 1480; *see also* 740 Ill. Comp. Stat. Ann. 10/11.

So, courts typically analyze monopoly claims under the Illinois Antitrust Act and the Sherman Act in one fell swoop. The claims rise and fall together. *See, e.g.*, *Nucap Indus., Inc. v. Robert Bosch LLC*, 273 F. Supp. 3d 986, 1010 (N.D. Ill. 2017); *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, 2015 WL 5693735, at *16 (N.D. Ill. 2015).

Philips agrees that the state law antitrust claims "stand or fall" with the Sherman Act claims. *See* Philips's Mem., at 4 n.4 (Dckt. No. 105) (citation omitted). GMI does not offer a reason to depart from that view. *See* GMI's Resp., at 2 n.4 (Dckt. No. 114) (only noting that the attempted monopolization claims and the monopolization claims have elements "in common").

There is no daylight between federal and Illinois law when it comes to antitrust claims. So the Court will consider them together, with federal law leading the way.

A monopolization claim under the Sherman Act has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *See Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000) (citing *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 481 (1992)).

An attempted monopolization claim has three elements: (1) the defendant's specific intent to achieve monopoly power in a relevant market; (2) predatory or anticompetitive conduct directed to accomplishing this purpose; and (3) a dangerous probability that the attempt at monopolization will succeed. *See Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011).

A plaintiff can satisfy the second element of each claim by showing that the defendant "engaged in predatory or anticompetitive conduct of some kind." *Id.* By the same token, conduct does not violate the antitrust laws unless it is anticompetitive. After all, antitrust law is about competition, not competitors. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990).

10

Philips pulls on this thread. It argues that GMI does not state any antitrust claims because it does not allege that Philips engaged in "anticompetitive conduct."[2] *See* Philips's Mem., at 7 (Dckt. No. 105). So, the Court turns there.

### A.    Anticompetitive Conduct

"Anticompetitive conduct is conduct without a legitimate business purpose that makes sense only because it eliminates competition." *See In re Deere & Co. Repair Serv. Antitrust Litig.*, 2023 WL 8190256, at *34 (N.D. Ill. 2023). In other words, conduct is anticompetitive when it is "in itself an independent violation of the antitrust laws" or "has no legitimate business justification other than to destroy or damage competition." *See City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 756 (N.D. Ill. 2019) (citing *Great Escape, Inc. v. Union City Body Co., Inc.*, 791 F.2d 532, 541 (7th Cir. 1986)).

Courts draw a line between "the kind of procompetitive conduct the antitrust laws do not impede," and anticompetitive conduct that is "prohibited as illegally acquiring or maintaining monopoly power." *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 452 (7th Cir. 2020).

Procompetitive conduct involves winning on the merits of the product or service at issue. Telltale signs include "innovation resulting in superior products" and "efficiencies reflecting superior business acumen." *Id.* at 452. On the flipside, conduct falls on the anticompetitive side of the line if it impairs a rival's "opportunity to compete" in a manner that is "inconsistent with competition on the merits." *Id.* at 452–53 (cleaned up). It's the difference between making a better pizza, and burning down the pizza parlor around the corner.

Other conduct falls outside the reach of the antitrust laws altogether. Some conduct is "*immunized* from antitrust liability." *See Mercatus Grp.*, 641 F.3d at 839 (emphasis added). The

---

[2] Philips also argues that GMI does not allege an antitrust injury. *See* Philips's Mem., at 4 (Dckt. No. 105). This Court does not reach the argument, because the anticompetitive conduct issue is dispositive.

conduct sits in an antitrust safe harbor. In particular, under the *Noerr-Pennington* doctrine, "defendants are immune from antitrust liability for engaging in conduct (including litigation) aimed at influencing decisionmaking by the government." *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 555–56 (2014).

The Seventh Circuit has addressed how to sort it out when the conduct in question involves some conduct that is immunized, and some conduct that is not. First, a court must "identify any conduct that is immunized" from antitrust liability. *Id.* Then a court must consider the "remaining challenged conduct in the aggregate to see if it is sufficient to support antitrust liability." *Id.*; *see also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 828 (N.D. Ill. 2020) ("[B]ecause immunized conduct cannot be aggregated with nonimmunized conduct without nullifying the immunity, it is necessary to identify protected and unprotected conduct."); *U.S. Futures Exch., LLC v. Bd. of Trade of City of Chi., Inc.*, 346 F. Supp. 3d 1230, 1249 (N.D. Ill. 2018) ("[A] court on summary judgment must first identify any conduct that is immunized, and after doing so, consider the evidence on the *remaining* challenged conduct in the aggregate to see if it is sufficient to support antitrust liability.") (cleaned up) (emphasis in original).

Philips takes aim at the counterclaims by addressing the conduct in five separate batches. The batches include: (1) the software upgrade; (2) the refusal to deal; (3) the "essential facility" argument; (4) the trade-in values; and (5) the litigation. *See* Philips's Mem., at 7–15 (Dckt. No. 105).

Philips addresses each piece separately, explaining why in its view the alleged conduct was not anticompetitive. *Id.* GMI, however, puts all of the conduct into one big pot, swirls it all together, and declares the concoction anticompetitive.

12

The Court will summarize the positions, before diving in.

## B.     The Five Types of Anticompetitive Conduct

### 1.     The Software Upgrade

The first type of anticompetitive conduct involves the software upgrade.  GMI alleges that Philips redesigned its software to make it harder – if not impossible – for independent organizations to service the ultrasound machines.  *See* Counterclaims, at ¶¶ 44–48, 54–56 (Dckt. No. 98).

Philips argues that this allegation does not plead anticompetitive conduct.  It notes that "courts are properly very skeptical about claims that competition has been harmed by a dominant firm's product design changes."  *See* Philips's Mem., at 8 (Dckt. No. 105) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 65 (D.C. Cir. 2001)).  It also points to case law supporting the notion that a design change providing "a new benefit" to consumers does not violate the antitrust laws "absent some associated anticompetitive conduct."  *Id.* (quoting *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998–99 (9th Cir. 2010)).

### 2.     Refusal to Deal.

The next form of anticompetitive conduct involves a refusal to deal.  GMI alleges that Philips "refuses" to give GMI access to the ultrasound equipment service platform.  *See* Counterclaims, at ¶¶ 54–55 (Dckt. No. 98); *see also id.* at ¶¶ 39–48, 54–56.

"Monopolists are both expected and permitted to compete like any other firm."  *See Viamedia, Inc.*, 951 F.3d at 454.  "Part of competing like everyone else is the ability to make decisions about with whom and on what terms one will deal."  *Id.* (citation omitted).  So, "the general rule is that even monopolists are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."  *Id.* (cleaned up).

But "there are limited circumstances under which a monopolist's refusal to deal with another party *will* be illegal anticompetitive conduct." *Id.* (cleaned up) (emphasis added); *see also Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("Under certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2. We have been very cautious in recognizing such exceptions[.]").

Philips offers a few responses to the allegations. *See* Philips's Mem., at 9–11 (Dckt. No. 105). Philips primarily responds that GMI does not allege anticompetitive conduct because Philips has no "prior, voluntary course of dealing" with GMI. *Id.* at 10.

To support its argument, Philips cites case law for the proposition that antitrust law "does not require monopolists to cooperate with rivals by selling them products that would help the rivals to compete." *Id.* (citing *Schor v. Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006)). Even a monopolist does not have to lend a helping hand to a competitor trying to bring it down.

### 3.     Essential Facility

The next type of conduct involves the allegation that Philips's service platform is an "essential facility," and that Philips has improperly denied GMI access. *See* Counterclaims, at ¶ 56 (Dckt. No. 98).

The essential facilities doctrine is a strain of a "refusal to deal." *See MCI Commc'ns Corp. v. AT&T*, 708 F.2d 1081, 1132 (7th Cir. 1983). The idea is that a monopolist refuses to give its competitors access to an essential facility.

The doctrine has four elements: "(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility."

14

*See VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, 2016 WL 4945015, at *5 (N.D. Ill. 2016) (citing *MCI Commc'ns Corp.*, 708 F.2d at 1132–33).

An "essential facility" is just what it sounds like. For example, an owner of a professional sports team might claim that a "municipal sports stadium" is an essential facility "to run a professional basketball franchise." *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 771 (4th & 5th ed. 2018–2024). A surgeon might claim that a hospital is an essential facility "to engage in his surgical practice." *Id.* A fisherman might claim that the one dock in town is an essential facility to run his salmon harvesting operation. And so on.

The Supreme Court has not recognized or rejected the essential facilities doctrine. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 611 n.44 (1985) ("[W]e find it unnecessary to consider the possible relevance of the 'essential facilities' doctrine[.]"); *Trinko*, 540 U.S. at 410–11 ("We have never recognized such a doctrine, and we find no need either to recognize it or repudiate it here.") (internal citation omitted).

Philips argues that its intellectual property does not qualify as an essential facility. According to Philips, the "very premise" of an intellectual property essential facility theory "is at odds with the pro-innovation rights afforded to intellectual property owners." *See* Philips's Mem., at 12 (Dckt. No. 105).

After all, the whole point of intellectual property is exclusivity. That's why it's valuable.

Philips cites a case stating that requiring "one company to provide its intellectual property to a competitor would significantly chill innovation." *Id.* (quoting *In re Microsoft Corp. Antitrust Litig*, 274 F. Supp. 2d 743, 745 (D. Md. 2003)); *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*

¶ 709 (4th & 5th ed. 2018–2024) ("A refusal to license an intellectual property right is quite different in character from a refusal to deal generally.").

### 4.    Trade-In Values

Marching on, the next set of allegations is about used parts.  GMI alleges that Philips acted anticompetitively when it offered its customers higher trade-in values for old parts.  *See* Counterclaims, at ¶¶ 57–59, 164 (Dckt. No. 98).

In response, Philips argues that the higher trade-in values mean that a customer pays *less* money for a new ultrasound machine.  *See* Philips's Mem., at 13 (Dckt. No. 105).  Philips thinks that antitrust law celebrates – not condemns – the lower prices it spurred.  *Id.* (quoting *VBR Tours*, 2015 WL 5693735, at *14 ("[A]ntitrust law encourages rather than prohibits low prices.")).

### 5.    Litigation

The last batch of conduct involves litigation itself.  GMI alleges that Philips is weaponizing the judicial process, bringing spurious litigation to beat down potential rivals.  *See* Counterclaims, at ¶¶ 60–62 (Dckt. No. 98).

Philips responds that its lawsuits are not anticompetitive.  *See* Philips's Mem., at 14–15 (Dckt. No. 105).  Specifically, Philips argues that even though GMI labels the lawsuits as "sham litigation," Philips enjoys "the presumption of immunity under the *Noerr-Pennington* doctrine." *Id.* at 14.

Under the *Noerr-Pennington* doctrine, "defendants are immune from antitrust liability for engaging in conduct (including litigation) aimed at influencing decisionmaking by the government."  *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 555–56 (2014); *see also Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127,

16

135 (1961) ("[N]o violation of the [Sherman] Act can be predicated upon mere attempts to influence . . . enforcement of laws.").

The doctrine has a narrow exception for sham lawsuits. *See U.S. Futures Exch., LLC v. Bd. of Trade of City of Chi., Inc.*, 953 F.3d 955, 963 (7th Cir. 2020). Immunity disappears when the litigation is (1) objectively baseless, and (2) subjectively motivated to interfere directly with the business relationship of a competitor. *See Pro. Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993).

Philips argues that its litigation fits snugly within *Noerr-Pennington*. *See* Philips's Mem., at 14–15 (Dckt. No. 105). And it says that the litigation is no sham. For example, Philips asks this Court to take judicial notice of the fact that Philips emerged victorious in one of the lawsuits that GMI mentioned. *Id.* at 15 n.11 (citing *Philips N. Am. LLC v. KPI Healthcare, Inc.*, 19-cv-01765-JVS-JDE (C.D. Cal.); *cf.* Counterclaims, at ¶ 60 (Dckt. No. 98). And "a successful action" can't "be characterized as a sham." *See U.S. Futures Exch.*, 953 F.3d at 963 (cleaned up) (emphasis omitted).

### C.   Putting It All Together

That's a high-level summary of GMI's allegations, and the response by Philips. Through it all, one thing jumps out.

GMI did not come to the defense of its allegations of anticompetitive conduct by addressing them separately. In fact, GMI told the Court that its antitrust counterclaims are "*not that each* act violates the antitrust laws." *See* GMI's Resp., at 5 (Dckt. No. 114) (emphasis added).

GMI implies that each of Philips's activities – viewed "alone" – might pass muster under the antitrust laws. *Id.* Specifically, GMI stated that "[c]ollective conduct supports a monopolization claim even if each aspect alone might have been lawful." *Id.*

Instead, GMI revealed that its theory is that Philips's "aggregate" conduct violates the antitrust laws. *Id.* But GMI did not explain why Philips's "aggregate" conduct violates the antitrust laws.

Specifically, GMI stated that "[c]ollective conduct supports a monopolization claim even if each aspect alone might have been lawful." *Id.* In other words, GMI implies that each of Philips's activities – viewed "alone" – might pass muster under the antitrust laws. *Id.*

It is true that courts look at conduct in the aggregate, and consider a potential monopolist's actions as a whole. Courts don't take a divide-and-conquer approach. *See, e.g., LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) ("[C]ourts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation."); *City of Mishawaka, Ind. v. American Elec. Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980). The big picture is what matters.

Sometimes the whole is greater than the sum of its parts. Then again, sometimes a collection of bad arguments simply adds up to one big bad argument.

At bottom, GMI has the burden of coming to the defense of its counterclaims. And here, GMI fell short. GMI did not demonstrate why any of the actions, viewed separately, violated the antitrust laws. And GMI did not explain why the conduct, viewed as a whole, violated the antitrust laws, either.

It is not good enough to respond, as GMI did, that courts must look at the conduct in the aggregate. Philips moved to dismiss, and GMI needed to demonstrate why the conduct, viewed as a whole, states a monopolization claim.

GMI did no such thing. Instead, GMI simply pointed at a big pile of allegations, and called it a day. There is a big difference between saying that courts can consider conduct in the aggregate (as GMI did), and demonstrating why the conduct in the aggregate gives rise to a monopolization claim (as GMI didn't).

The response is too skeletal, and a skeletal response is no better than a failure to respond at all. The failure to put any meat on the bone means that the counterclaims do not deserve to remain in the case. A litigant's "failure to respond to a Rule 12(b)(6) motion giving plausible reasons for dismissal provides adequate grounds for granting the motion." *See Diggs v. Lowe's Home Ctrs., LLC*, 2022 WL 3543496, at *2 (N.D. Ill. 2022) (citation omitted).

For those reasons, the motion to dismiss the antitrust counterclaims (Counts VII – X) is hereby granted. *See Philips N. Am., LLC v. Summit Imaging Inc.*, 2020 WL 6741966, at *9 (W.D. Wash. 2020) (granting Philips's motion to dismiss counterclaims based on similar theories).

## II. Duplicative Claims and Counterclaims

Next, Philips moves to dismiss the five counterclaims that seek a declaratory judgment. The main idea is that the counterclaims are duplicative of the claims in the complaint, so there is no value-add to having them in the case.

The Declaratory Judgment Act vests district courts with the power to issue declaratory judgments. *See* 28 U.S.C. § 2201 *et seq.* That power is discretionary, as revealed by the text of the statute. A district court "*may* declare the rights and other legal relations of any interested

parties seeking such declaration." *See* 28 U.S.C. § 2201(a) (emphasis added). "May" is one of the favorite words of every district court judge, because it reveals the presence of discretion.

A party does not have an absolute right to obtain a declaratory judgment. The Declaratory Judgment Act is "an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995) (citation omitted). That is, "district courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Id.* at 282. That discretion largely turns on "practicality and wise judicial administration." *Id.* at 288.

In some cases, the better course is to decline the request for a declaratory judgment. A request for a declaratory judgment sometimes does not advance the ball. In fact, sometimes a request for a declaratory judgment would set the ball back.

Sometimes claims and counterclaims are a mirror image of each other, especially when they seek a declaratory judgment. A complaint might seek a declaration of "X," and a counterclaim might seek a declaration of "not-X."

For example, an insured might file a complaint and seek a declaratory judgment that there is coverage under the policy. The insurance company might file a counterclaim and seek a declaratory judgment that there is no coverage. It's six of one, half a dozen of the other.

Except it's worse. Claims and counterclaims that cover the same ground are a recipe for double trouble.

From a pragmatic standpoint, it isn't hard to see how duplicative claims and counterclaims can cause mischief. Claims and counterclaims eventually wind up before the jury.

If claims and counterclaims cover the same terrain, the jury would have to answer the same question twice.

Nothing good can happen from asking a jury the same question twice.

For starters, duplication would create more work for the jury. Jurors are guests in the legal system, and they deserve treatment as honored guests. Jury service is public service, and it invariably imposes on the jurors' personal and professional lives.

Deciding a verdict is hard enough already, especially after a long trial in federal court. Juries have enough work on their plates, without having to answer unnecessary questions. Duplicative questions create make-work.

Worse yet, asking the same question twice would create confusion. The jury naturally would ask itself a simple question: "Didn't you just ask us that?" The confusion could lead jurors to overly parse the questions, looking for nuanced micro-differences.

And even worse yet, asking the same question twice could lead to inconsistent answers. Imagine if a jury decided the claim and found that there was no coverage. And then, imagine if the same jury decided the counterclaim, and answered the question by finding that there *was* coverage. Then what?

For example, imagine if a claim asked the jury to decide the outcome of a football game (Question #1). And then, imagine if the counterclaim asked the jury to decide the same question, from a different angle (Question #2).

    1.  Did the Bears beat the Packers?

    2.  Did the Packers lose to the Bears?

A jury might respond:

    1.  Yes – the Bears beat the Packers.

21

     2.   Yes – the Packers lost to the Bears.

The second question doesn't add much value. It would force the jury to decide the same issue a second time. They might get confused. And they might give a different answer if asked the same thing twice.

More questions are more work. Repeating the same question would create confusion, and would run the risk of different answers. Duplicative counterclaims serve no useful purpose, and would throw sand in the gears of smooth-running litigation. They offer nothing, except trouble.

For that reason, courts take a dim view of counterclaims that simply take the opposite side of a claim. Court routinely dismiss counterclaims that essentially present the flipside of claims in the complaint. *See, e.g.*, *LKQ Corp. v. Rutledge*, 2022 WL 1720590, at *6 (N.D. Ill. 2022); *Maui Jim, Inc. v. SmartBuy Guru Enters.*, 2018 WL 509960, at *8 (N.D. Ill. 2018) (collecting cases); *Bodum USA, Inc. v. A Top New Casting Inc.*, 2016 WL 4440258, at *1–2 (N.D. Ill. 2016); *Intercon Sols., Inc. v. Basel Action Network*, 969 F. Supp. 2d 1026, 1065 (N.D. Ill. 2013) ("[C]ourts routinely dismiss counterclaims that seek to generate an independent piece of litigation out of issues that are already before the court; this includes counterclaims that merely restate an affirmative defense, as well as those which simply seek the opposite effect of the complaint.").

As Philips sees things, five of the counterclaims suffer from that problem. Philips argues that five of the counterclaims are the flipside of claims in the complaint. So there isn't any need for them to stay in the case.

The Court will address each of these five counterclaims, after sorting them into three different groups. The punchline is that the counterclaims in question are, in fact, duplicative or would add nothing of value for other reasons. So they don't belong in the case.

## A. Counts I, II, and V of the Counterclaims

It doesn't take much effort to see that three of the counterclaims simply take the opposite side of claims in the complaint.

Count I of the counterclaims seeks a declaration that GMI did not violate the Digital Millennium Copyright Act. *See* Counterclaims, ¶¶ 78–92 (Dckt. No. 98). That's duplicative of Count I of the complaint. *See* Cplt., at ¶¶ 73–95 (Dckt. No. 1).

Count II of the counterclaims seeks a declaration that GMI did not violate the Computer Fraud and Abuse Act. *Id.* at ¶¶ 93–102 (Dckt. No. 98). That's duplicative of Count V of the complaint. *See* Cplt., at ¶¶ 164–75 (Dckt. No. 1).

Count V of the counterclaims seeks a declaration that GMI did not violate the Defend Trade Secrets Act or the Illinois Trade Secrets Act. *Id.* at ¶¶ 127–42 (Dckt. No. 98). That's duplicative of Counts III and IV of the complaint. *See* Cplt., at ¶¶ 132–63 (Dckt. No. 1).

GMI doesn't muster much of a defense of the counterclaims. GMI simply says that its counterclaims seek "affirmative relief," while its defenses to Philips's claims are "affirmative defense[s]." *See* GMI's Resp., at 11–12 (Dckt. No. 114).

A party doesn't need to play both offense and defense on each snap of the ball. It is enough for the jury to decide the question once.

For that reason, Counts I, II, and V of the counterclaims are dismissed as duplicative.

## B.    Count VI of the Counterclaims

The next counterclaim is Count VI.  Like Count V, Count VI is about the Illinois Trade Secrets Act and the Defend Trade Secrets Act.  *See* Counterclaims, at ¶¶ 144–45 (Dckt. No. 98).

Unlike Count V, Count VI does not seek a declaratory judgment.  Instead, GMI asks for attorneys' fees.  *See* Counterclaims, at ¶ 153 (Dckt. No. 98) ("[GMI is] entitled to obtain reasonable attorneys' fees to be determined by the court.").  Both statutes allow courts to award attorneys' fees to a victorious defendant if the plaintiff brought claims under the Acts in bad faith.  *See* 765 Ill. Comp. Stat. Ann. 1065/5; *see also* 18 U.S.C. § 1836(b)(3)(D).

GMI does not "need its counterclaim" to recover fees under the statutes.  *See PopSockets LLC v. P'ships & Unincorporated Ass'ns Identified on Schedule A*, 2023 WL 130524, at *2 (N.D. Ill. 2023).  If GMI defeats Philips's claims, and comes out victorious, *then* it can make its pitch for fees under the statutes.

Including a request for attorneys' fees here and now would serve no purpose.  It would create confusion, too.[3]  *See PopSockets*, 2023 WL 130524, at *2 (dismissing counterclaims seeking fees under a fee-shifting statute as unnecessary because "[i]f [Defendant] defeats [Plaintiff]'s affirmative claims, it qualifies as the prevailing party and will have the opportunity to argue that an award of attorney's fees is warranted."); *see also Malibu Media, LLC v. Redacted*, 705 F. App'x 402, 406–07 (6th Cir. 2017) (affirming the dismissal of a counterclaim seeking attorney's fees under a fee-shifting provision as "redundant").

Count VI of the counterclaims is dismissed.

---

[3]  If necessary and appropriate, maybe the Court could consider a special interrogatory to the jury about whether Philips brought the claim in bad faith.  Then again, maybe that's a question for the Court, not the jury.  In any event, the parties did not address who decides the issue of bad faith, and this Court does not need to decide that question now.

### C.      Count III of the Counterclaims

Finally, Philips takes aim at Count III of the counterclaims, which involves the Copyright Act.  GMI seeks a declaration that the Philips copyrights are unenforceable due to misuse.  *See* Counterclaims, at ¶¶ 103–16 (Dckt. No. 98).

Philips also argues that this Court should dismiss one last claim as redundant.  *See* Philips's Mem., at 15 n.12 (Dckt. No. 105).  Philips argues that Count III duplicates GMI's seventh affirmative defense.  *Id.*

Count III asks for a declaratory judgment that Philips's copyrights are "unenforceable due to misuse of its copyrights."  *See* Counterclaims, at ¶ 116 (Dckt. No. 98).

That argument overlaps with an affirmative defense.  GMI's seventh affirmative defense argues that Philips's copyright claims are barred due to its "copyright misuse."  *See* Answer, at 56 (Dckt. No. 98).

 "Copyright misuse is a judicially created affirmative defense to copyright infringement, derived from the long-standing existence of such a defense in patent litigation."  *See Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1157 (9th Cir. 2011).

The Supreme Court recognized the patent misuse defense 80 years ago in *Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488 (1942).  *See* 5 William F. Patry, *Patry on Copyright* § 17:128 (2024 ed.).  About five decades later, the Fourth Circuit extended the misuse rationale to copyrights.  *See Apple Inc.*, 658 F.3d at 1157 (citing *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 972 (4th Cir. 1990)).

The doctrine "bars a *culpable* plaintiff from prevailing on an action for an infringement of the misused copyright."  *See Ass'n of Am. Med. Colls. v. Princeton Rev.*, 332 F. Supp. 2d 11, 17 (D.D.C. 2004) (emphasis added) (citing *Lasercomb*, 911 F.2d at 972).  "The doctrine forbids

the use of the copyright to secure an exclusive right or limited monopoly not granted by the Copyright Office and which is contrary to public policy to grant." *Id.*

The idea is that a copyright holder needs to stay in its copyright's lane. A holder can't win a copyright infringement lawsuit when it is "misusing" the copyright and trying to secure a "competitive advantage *beyond the scope* of the monopoly created by the copyright itself." *See Soos & Assocs., Inc. v. Five Guys Enters., LLC*, 425 F. Supp. 3d 1004, 1012 (N.D. Ill. 2019) (emphasis added) (citation omitted). The defense keeps copyright holders between the lines.

The Third, Fifth, and Ninth Circuits have followed the Fourth Circuit's lead. Those circuits recognize copyright misuse as an affirmative defense.[4] Other circuits have not taken that step.[5]

For its part, the Seventh Circuit seems to have recognized – or at least come right up to the line of recognizing – the affirmative defense. Judge Posner described the doctrine as preventing "copyright holders from leveraging their limited monopoly to allow them control of areas outside the monopoly." *See Assessment Techs. of Wis., LLC v. WIREdata, Inc.*, 350 F.3d

---

[4] *See, e.g.*, *Brand Design Co., Inc. v. Rite Aid Corp.*, 2023 WL 3819364, at *5 (E.D. Pa. 2023) ("The Third Circuit has affirmatively recognized the copyright misuse doctrine as an affirmative defense.") (cleaned up); *DSC Commc'ns Corp. v. DGI Techs., Inc.*, 81 F.3d 597, 601 (5th Cir. 1996) ("The defense of copyright misuse bars a culpable plaintiff from prevailing on an action for the infringement of the misused copyright.") (cleaned up); *Apple, Inc.*, 658 F.3d at 1157 (noting that the Ninth Circuit has "recognized the existence of a copyright misuse doctrine" but has "applied the doctrine sparingly.").

[5] *See, e.g.*, *Garcia-Goyco v. Law Env't Consultants, Inc.*, 428 F.3d 14, 21 n.7 (1st Cir. 2005) ("This court has not yet recognized misuse of a copyright as a defense to infringement."); *O'Neil v. Ratajkowski*, 563 F. Supp. 3d 112, 135 (S.D.N.Y. 2021) ("The defense of copyright misuse has not been firmly established in the Second Circuit[.]") (cleaned up); *Int'l Motor Contest Ass'n, Inc. v. Staley*, 434 F. Supp. 2d 650, 665 (N.D. Iowa 2006) ("[T]he Eighth Circuit Court of Appeals . . . [has] found that the purported 'misuse of copyright' defense presented in a particular case failed on insufficiency of the supporting factual allegations, making it unnecessary to decide whether or not to recognize the defense as a matter of law."); *Pk Studios, Inc. v. R.L.R. Invs., LLC*, 2016 WL 4529323, at *5 (M.D. Fla. 2016) ("Although the Eleventh Circuit has not recognized misuse as a defense for infringement suits, neither has it rejected misuse as a valid defense.") (cleaned up); *SoundExchange, Inc. v. Muzak, LLC*, 2020 WL 13611363, at *5 (D.D.C. 2020) ("While the Circuit has never recognized the copyright misuse defense, several other circuit courts of appeal have accepted the doctrine.").

640, 647 (7th Cir. 2003). Judge Posner noted that the Seventh Circuit had previously "left open" whether copyright misuse, "unless it rises to the level of an antitrust violation, is a defense to infringement." *Id.* But he concluded that there was no need to "run this hare to the ground." *Id.*

The Seventh Circuit seems to have blessed the copyright misuse defense when the misuse "rises to the level of an antitrust violation." *Id.*; *cf.* 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.09[A][3][b] (2023) (describing the Seventh Circuit's decision as "not rul[ing] on misuse" but "recogniz[ing] a misuse defense").

But an affirmative defense is *not* the same thing as a standalone claim. And GMI wants to assert copyright misuse as a standalone claim.

"Courts are divided over whether copyright misuse constitutes an independent cause of action." *See Soos*, 425 F. Supp. 3d at 1014. A smattering of courts recognize misuse as its own claim.[6] Philips is a repeat player in the case law recognizing copyright misuse as a counterclaim. *See* William F. Patry, *Patry on Copyright* § 10A:1 n.1 (2024) ("Philips North America seems to have this case law all by itself.").

A considerable body of case law weighs down the other side of the scale. Many courts reject copyright misuse as a standalone claim. *See, e.g.*, *Malibu Media, LLC v. Khan*, 2019 WL 1382082, at *3 (N.D. Ill. 2019) ("[The defendant's] request for copyright misuse seeks no affirmative relief other than a determination that her affirmative defense is meritorious. For this reason, the request is not appropriately a counterclaim[.]") (internal citations omitted); *Brand*

---

[6] *See, e.g.*, *Midwest Tape, LL v. Recorded Books, LLC*, 2010 WL 1258101, at *1 (N.D. Ohio 2010) ("[B]ecause the Complaint seeks [a] declaratory judgment, the plaintiff may assert copyright misuse as an affirmative claim."); *Amaretto Ranch Breedables v. Ozimals, Inc.*, 907 F. Supp. 2d 1080, 1085 (N.D. Cal. 2012) ("[In] the cases permitting copyright misuse as a freestanding cause of action, such claims are nothing more than actions for declaratory relief."); *Philips N. Am. LLC v. KPI Healthcare, Inc.*, 2020 WL 5260865, at *3 (C.D. Cal. 2020); *Philips N. Am., LLC v. Summit Imaging Inc.*, 2020 WL 6741966, at *8 (W.D. Wash. 2020); *Philips N. Am. LLC v. Advanced Imaging Servs., Inc.*, 2022 WL 1138076, at *5 (E.D. Cal. 2022).

*Design Co.*, 2023 WL 3819364, at *6 ("[C]ourts in the Third Circuit have generally rejected copyright misuse as a standalone claim."); *BWP Media USA Inc. v. Death Adders Inc.*, 2015 WL 13653968, at *3 (E.D.N.Y. 2015) ("[T]he Second Circuit has explicitly declined to recognize an independent cause of action for copyright misuse.") (cleaned up).

Again, this Court has discretion when it comes to a request for a declaratory judgment. The "Declaratory Judgment Act says only that the court *may* declare the rights and other legal relations of any interested party, not that it *must* do so." *See Amling v. Harrow Indus. LLC*, 943 F.3d 373, 379 (7th Cir. 2019) (cleaned up) (emphasis in original). "This statutory language has long been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Id.* (cleaned up).

This Court declines to entertain a request for a declaratory judgment when it comes to GMI's copyright misuse counterclaim. Courts are divided on whether copyright misuse can stand alone as an independent claim. And this Court does not see a good reason why "separately litigating" GMI's affirmative defense "in a declaratory posture" would move the ball forward. *See Soos*, 425 F. Supp. 3d at 1015 (cleaned up) (dismissing a copyright misuse declaratory judgment counterclaim).

Count III of the counterclaims is dismissed.

## III.     The Remaining Counterclaims

Finally, Philips asks this Court to dismiss GMI's remaining claims. *See* Philips's Mtn. to Dismiss, at 15 n.12 (Dckt. No. 105). Philips makes a conclusory argument about a conclusory counterclaim.

Philips stuffs its first request into a footnote: "Counts 11–14 fail to plead facts sufficient to state a plausible claim and instead rely on conclusory assertions that fail to establish that these

claims are plausible." *Id.* (citations omitted).  A few citations – without parenthetical explanations – trail the lonely sentence.  *See id.*

So, Philips accuses GMI of being conclusory, in conclusory fashion.

Philips floats another argument about another count, in the same footnote.  *Id.*  Philips says that "Count 4 seeks an improper advisory opinion that all of GMI's past and future conduct is within the scope of unidentified license agreements for unidentified customers."  *Id.*  The sentence stands alone, without supporting citations.

The arguments are perfunctory, so they are no better than no argument at all.  *See Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 704 (7th Cir. 2022) ("[P]erfunctory and underdeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived.") (citation omitted).

Philips didn't put anything on the table.  This Court won't bite.[7]  Count IV and Counts XI through XIV of the counterclaims survive.

## Conclusion

For the foregoing reasons, Philips's motion to dismiss the counterclaims is granted in part and denied in part.  The Court grants the motion to dismiss the antitrust counterclaims (Counts VII to X).  The Court grants the motion to dismiss the counterclaims that seek a declaratory judgment (Counts I, II, and V), seek attorneys' fees (Count VI), and allege misuse of copyrights (Count III).  The Court denies the motion to dismiss the remaining counterclaims.

---

[7]  To the extent that Philips's "advisory opinion" argument is a challenge to jurisdiction under Article III, this Court encourages Philips to flesh out its argument at summary judgment.  And GMI must explain what relief it seeks, too.  The Court doesn't have enough from the parties to go on.

Date:  September 19, 2024

Steven C. Seeger
United States District Judge